

*FILED*

*IN*

2015 APR -8 A 9: 26

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

FILED
CLERK, U.S. DISTRICT COURT
**AUG 1 4 2015**
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### *Jacksonville Division*

**C V 1 5 - 0 6 1 7 7** -AB(JEM(x)

Case No. 3:15-CV-445-J-32PDB

|  |  |
|---|---|
| UNITED STATES OF AMERICA EX REL. NEYIRYS OROZCO | ) ) ) |
| **Plaintiffs** | ) ) |
| v. | ) ) ) |
| TWIN MED LLC., SHLOMO RECHITZ, JONATHAN WEISS, RIVERSIDE HEALTHCARE, WELLNESS CENTRE, LLC, ALTA VISTA HEALTHCARE & WELLNESS CENTRE, CITRUS WELLNESS CENTRE, LLC, RECHNITZ CITRUS, GP BRIUS MANAGEMENT CO. INC., BRIUS LLC, SOL MANAGEMENT, LLC, DOES 1-100, ROCKPORT HEALTHCARE SERVICES, ROCKPORT, GAMAL GHALY, JOEL PENGSON, AND GHASAN TABEL. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| **Defendants.** | ) ) ) |

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, The Stark Act, 42 U.S.C. § 1395nn(a)(l), and The Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b).**

**FILED UNDER SEAL**

**Jury Trial Demanded**

RECEIVED
CLERK, U.S. DISTRICT COURT
**AUG 1 3 2015**
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## Introduction

1.    Qui tam relator Neyirys Orozco, by and through her attorneys, individually and on

behalf of the United States of America, files this complaint against Twin Med, LLC, a

corporation with offices in Orlando, Florida ("Twin Med"), Shlomo Rechnitz ("Rechnitz");

Jonathan Weiss ("Weiss"); Rechnitz Citrus GP ("Rechnitz Citrus"); Citrus Wellness Center,

LLC ("Citrus Wellness"); Riverside Healthcare & Wellness Centre, LLC, ("Riverside"); Alta

Vista Healthcare and Wellness Centre ("Alta Vista"); Brius Management Co. Inc. ("Brius

1



Management"); Brius LLC ("Brius"); Sol Management, LLC ("Sol"); Does 1-100; Rockport

Healthcare Services ("Rockport"); Dr. Gamal Ghaly ("Dr. Ghaly"), Dr. Joel Pengson ("Dr.

Pengson"), and Dr. Ghasan Tabel ("Dr. Tabel") (hereinafter collectively referred to as

"Defendants") [1] to recover damages, penalties, and attorneys' fees for violations of the federal

False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, The Stark Act, 42 U.S.C. § 1395nn(a)(l), and The

Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b).

2. Beginning in February 2012, Orozco worked at Riverside, a skilled nursing

facility located in Southern California.

3. Riverside is one facility within an extremely complex maze of corporations, all of

which lead back to its owner, Shlomo Rechnitz.

4. During Orozco's time at Riverside, she witnessed a whole host of fraudulent

activities, all of which were a part of Defendants' efforts to collect as much Medicare

reimbursement funds as possible.

5. Rechnitz directs the other Defendants to engage in many, if not all, of these

fraudulent activities, some of which involve Defendants' Florida operations.

6. The Corporate Defendants give doctors and hospital case managers almost any

type of incentive – cash, gifts, gift cards, attractive women, dinners – in exchange for patient

referrals.

7. Additionally, several doctors have illegal financial relationships with the

Corporate Defendants, in the form of a salaries and bonuses, in exchange for patient referrals.

---

[1] Shlomo Rechnitz; Jonathan Weiss; Rechnitz Citrus GP; Citrus Wellness Center, LLC; Riverside Healthcare & Wellness Centre, LLC; Alta Vista Healthcare and Wellness Centre; Brius Management Co. Inc.; Bruis LLC; Sol Management, LLC; Does 1-100; Rockport Healthcare Services; Twin Med, LLC are hereinafter referred to as "Corporate Defendants."

8.      Once Defendants are able to secure patients at their facilities, they consistently placed them on the highest levels of therapy possible, when, in almost all instances, the patients require little to no therapy.

9.      Defendants direct staff to treat Medicare patients as VIPs to the exclusion of everyone else.

10.      Accordingly, Defendants give Medicare patients whatever they want – food, money, rent payment, waiver of required medical costs, and other incentives – to persuade them to stay at the facility as long as possible.

11.      Defendants also submit materially false statements and information to Medicare.

12.      Defendants alter paperwork, direct their staff to pretend to be patients to ensure that benefits continue, and falsify patients' conditions to recertify a patient for continued care.

13.      Defendants' demonstrate their intent to engage in such rampant fraudulent behavior in several ways.

14.      Defendants hold daily meetings in which management discusses the current status of all Medicare patients and how to discourage Medicare patients from leaving the facility.

15.      Defendants also offer Medicare enrollment goals and rewards to their managers and staff.

16.      When Orozco requested that the State of California investigate matters at Riverside, the State and Riverside did nothing to change its practices.

17.      Finally, the Corporate Defendants unlawfully retaliated against Orozco because of her complaints for calling the state regarding Riverside's unlawful practices.

## Jurisdiction and Venue

18.     This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730 and 3732.

19.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732 (a) because Defendants transacts business in this judicial district.

20.     Venue is proper in this District pursuant to 31 U.S.C. § 3732 (a) and under 28 U.S.C. § 1391(c) because Defendants transacts business in the Western Division of this judicial district and because several of the acts alleged herein occurred in the Western District of Florida

## Parties

### Relator Neyirys Orozco

21.     Relator Neyirys Orozco is currently a resident of Perris, California.

22.     Orozco represents an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and states that to her knowledge, the information contained herein has not been publicly disclosed.

23.     On or around February 14, 2012, Riverside hired Orozco as its Accounts Payable Representative and Payroll Coordinator.

24.     In June 2013, Riverside promoted Orozco to the position of Accounts Payable Representative and Director of Environmental Services in charge of housekeeping and laundry employees.

25.     In or about June 2014, Riverside again promoted Orozco to the position of Business Office Manager.

26.     In the role of Business Office Manager, Orozco was responsible for a wide variety of responsibilities including: billing to insurance companies, payroll, supervising certain

accounting duties, preparing reports on current patients, managing the trust accounts of the

patients, managing Riverside's bank accounts, and reviewing the admission of new patients.

**Defendants Shlomo Rechnitz; Rechnitz Citrus GP; Brius Management Co, Inc.; Brius, LLC, Sol Management, LLC; and Does 1-100**

27. The Corporate Defendants' complex corporate structure traces back to one

person: Shlomo Rechnitz.

28. Rechnitz, California's biggest nursing homeowner, has a maze of more than

eighty limited liability corporations tied to him and more than fifty nursing homes under his

ownership and control.

29. The Sacramento Bee newspaper conducted an investigation in Rechnitz's

ownership of nursing homes and created the following diagram:[2]



---

[2] This diagram is available at: http://www.sacbee.com/news/investigations/nursing-homes/article3586406.htm.

30.    Rechnitz owns Defendant Rechnitz Citrus GP.

31.    Upon information and belief, Rechnitz, Brius Management Co, Inc., Brius, LLC, Sol Management, LLC, and Does 1-100, own more than fifty facilities which are uniformly owned, operated, managed or controlled by Rechnitz. Riverside Healthcare & Wellness Centre, LLC, the facility which Orozco worked, is among these facilities and will be further discussed below.

32.    In 2014, when Rechnitz sought to buy several distressed nursing homes out of bankruptcy, he filed internally prepared 2013 combined financials for limited liability companies of which Brius Management is the managing member.

33.    In these filings, Rechnitz reported Brius Management's operating revue of $178.9 million and net income of $27.4 million.

34.    In a separate filing, under the title of "Brius Healthcare/Shlomo Rechnitz" the company reported overall revenue of $611 million and net income of $77 million.

35.    However, in 2014, Brius LLC told California auditors that it had no assets or income.

### Defendant Twin Med LLC

36.    Twin Med is a medical device supply company based in California but with warehouses in Florida and other states.

37.    Twin Med was co-founded by Rechnitz and his brother, Steve.

38.    In more than a dozen federal campaign finance reports, Rechnitz disclosed "TwinMed LCC" or "Twin Med LLC" as an employer, though the Twin Med parent company is based in California.

39.    Twin Med has a Florida subsidiary that leases more than 50,000 square feet of warehouse space located at 2126 West Landstreet Road in Orlando, Florida.

40.     Additionally, six trucks are titled and registered to Twin Med LLC at the same Orlando, Florida location.

**Defendants Rockport, Riverside, AltaVista, Jonathan Weiss, and Citrus Wellness**

41.     Defendant Rockport Healthcare Services, a California-based management group, is located in Los Angeles, California.

42.     Rockport is an administrative services company owned by Rechnitz's accountant, Steve Stroll and his wife, Marsha Stroll.

43.     Rockport owns Riverside Healthcare & Wellness Centre, LLC, along with several other skilled nursing home facilities in Southern California, amounting to approximately 1,000 beds.

44.     Riverside is a ninety nine bed skilled nursing facility that was converted to a short-term rehabilitation facility about three years ago.

45.     Riverside provides rehabilitation therapy as well as nursing services to patients.

46.     Riverside employees often travel to Rockport for training.

47.     From June 1, 2013 to May 31, 2013, Riverside posted a $1.4 million profit on $12 million in net patient revenue.

48.     During this time, Riverside spent more than $1 million on transactions with related parties, several of which are believed to be connected to Rechnitz.

49.     Since about February 2012, Riverside had approximately twenty-five to forty Medicare patients each month.

50.     The Vice President of Operations, Aneta Ayrapetyan, manages several Rockport-owned facilities, including Riverside.

51.     In addition to Rockport's ownership of Riverside, Riverside is owned by several other parties.

7

52.     Rechnitz, Rechnitz Citrus GP, and Johnathan Weiss have a five percent or more ownership in Riverside.

53.     According to the California Department of Health, Eretz Alta Vista Properties, LLC, is listed as the property owner of Riverside (and thus it appears that Alta Vista owns Riverside).

54.     Alta Vista, another skilled nursing home facility owned by Rechnitz, is located at 9020 Garfield Street, Riverside, California.

55.     California state records list Citrus Wellness Centre, LLC as Riverside's parent company.

56.     California state records also list two indirect owners of Riverside: Tamar Rechnitz (Shlomo's wife) who holds a one percent stake, and Rechnitz Citrus, GP, which holds a ninety-nine percent interest stake.

57.     Johnathan Weiss, in addition to partially owning Riverside, has interests in the following corporate entities: Orange Healthcare & Wellness Centre, LLC ("Orange Healthcare"); Imperial Heights Healthcare & Wellness Centre, LLC; Bakersfield Healthcare & Wellness Centre, LLC; and Royal Convalescent Hospital, Inc.

**Defendants Dr. Ghaly, Dr. Pengson, and Dr. Tabel**

58.     Drs. Ghaly, Pengson and Tabel have served as physicians at the following nearby hospitals: Parkview Community Hospital, Riverside Regional Medical Center and Riverside Community Hospital.

59.     Drs. Ghaly, Pengson and Tabel are also medical directors –but not employees – at Riverside.

8

## Factual Allegations

**I.**      **The Corporate Defendants Order Almost All Medical Supplies from Twin Med's Florida Location.**

60.      Rechnitz instructs the Corporate Defendants to order almost all of their medical supplies from Twin Med's warehouse located in Orlando, Florida.

61.      Riverside provides each patient with a daily allowance, approximately two dollars per patient, for various nursing supplies such as toothbrushes, combs, urinals, oxygen tanks, and bed mats.

62.      Shlomo, through Twin Med, also sells wheelchairs, beds and other medical equipment to Riverside but these supplies are not included in the patients' daily allowance.

63.      Riverside management sets the amount of the daily allowance and this amount changes monthly depending on how well Riverside did financially the previous month.

64.      At Riverside alone, the patients' daily allowance amounted to approximately $8,000 to $9,000 worth of supplies per month purchased from Twin Med.

65.      Orozco believes that Rechnitz requires that his other facilities also purchase its medical supplies from Twin Med.

66.      Riverside's Central Supply Director, Yocelyn Perez, was responsible for keeping an inventory of these supplies and tracking how many supplies each patient used.

67.      Instead, Ayrapetyan instructed Perez to make up the number of supplies each patient used and order additional supplies from Twin Med.

68.      Perez often complained that she needed a legitimate inventory system but Ayrapetyan told her to make the charges seem realistic.

## II.  Corporate Defendants' Management Structure

### a.  Each Rockport facility has at least one Administrator and one marketer.

69.  Each Rockport facility has at least one, and in some instances, more than one Administrator that oversees the facility's day to day functions.

70.  Riverside had several different Administrators over the last few years.

71.  The following people served as Administrators for Riverside: in 2011, Cary Von Boxtel; from December 2011 through June 2012, Christopher Romney (Mitt Romney's nephew); from June 2012 through March 2014, Micah Rhead; from March 2014 through September 2014, Raj Desai; and from September 2014 through November 2014, Cathy Campbell served as the Interim Administrator at Riverside.

72.  In November 2014, Corey Tillman began serving as Riverside's Administrator.

73.  The various Directors and Business Office Managers at each facility report to the facility's Administrator.

74.  Each facility under Rockport also has one marketer.

75.  The marketers report to Joy Smith and Lynn Naivson, Rockport's Regional Business Directors.

### b.  Each Administrator reports to Rockport's Vice President of Operations.

76.  Each of the facility Administrators reports to the Vice President of Operations, Ayrapetyan.

77.  Ayrapetyan has been the Vice President of Operations for Rockport the entire time Orozco was employed by Rockport.

78.     Ayrapetyan oversees other Rockport facilities including: Fresno, Mesa Verde, Oakhurst, Montecito, Orange Healthcare, Alta Vista, and North Point Healthcare & Wellness Centre.

### c.  Rockport's Vice President of Operations reports to the Rockport's Chief Operating Officer.

79.     Ayrapetyan in turn reports to Aaron Robin, the Chief Operating Officer of Rockport.

80.     Robin has been the Chief Operating Officer of Rockport the entire time Orozco was employed by Rockport.

81.     After serving as Interim Administrator at Riverside, Campbell moved to an Administrator position at Skyline Healthcare, to work alongside Robin.

### d.  Rechnitz hires certain managers at Riverside; Rockport's Vice President of Operations, Chief Operating Officer, and Regional Business Director all report to Rechnitz.

82.     In or around February 2011, Rechnitz directly hired Joy Smith to work as Admissions Director at Riverside.

83.     A few months later, Rechnitz promoted Smith to the position of Marketing Director and then hired Leah Pennaccio as the Admissions Director.

84.     In June 2013, Rechnitz promoted Smith to the position of Regional Business Director.

85.     Robin, Ayrapetyan and Smith report directly to Shlomo Rechnitz, the owner of the entire empire.

     **e.**   **Each Rockport facility pays doctors to serve as "Medical Directors" and "Quality Assurance Directors."**

86.    Each facility also has a number of doctors who serve as "Medical Directors" and "Quality Assurance Directors" for the facility even though they are not employed by the facility, or Rockport.

87.    As the medical directors are not employees of Rockport, they do not report directly to anyone in Rockport's management chain.

88.    During Orozco's time at Riverside, Dr. Gamal Ghaly, Dr. Joel Pengson, and Dr. Ghasan Tabel were Riverside's medical directors.

89.    All three doctors also served as physicians at the following nearby hospitals: Parkview Community Hospital, Riverside Regional Medical Center and Riverside Community Hospital.

## III.    Applicable Medicare Reimbursement Laws

90.    Medicare Part A covers inpatient services, while Medicare Part B covers outpatient services.

91.    Medicare Part A covers rehab or nursing care provided at SNFs, at a pre-determined daily rate for each day of care up to 100 days of care.

92.    For a patient to receive Medicare Part A coverage, the patient must have a three night qualifying stay at an acute hospital.

93.    An acute hospital provides inpatient medical care and other related services for patients who have experienced a severe episode of illness, for conditions that are a result of disease or trauma and during recovery from surgery.

94.    The Prospective Payment System (PPS) is a method of reimbursement in which Medicare payment is made based on a predetermined, fixed amount.

95.     Under the PPS system, the amount of payment for a particular service is based on how that service is categorized.

## IV.     Applicable RUG Requirements

96.     Rehab therapy is classified by different Resource Utilization Group ("RUG") levels.

97.     The PPS system categories the RUG levels into approximately fifty-three separate levels; twenty-three pertain to rehab services and thirty pertain to nursing services.

98.     Patients requiring physical, occupational and/or speech therapy are generally assigned to the special rehab category, which is the type of therapy that Defendants provide to their Medicare Part A patients.

99.     From this special rehabilitation category, the rehab levels are further broken up into five sub-categories: Low (RLx), Medium (RMx), High (RHx), Very High (RVx), Ultra High (RUx).

100.    The first two letters of sub-category pertain to the rehab level (for example: RU = Ultra High).

101.    The third letter of the sub-category pertains to the level of nursing required, these are usually denoted by the letters x, g, or l.

102.    The level of therapy likely will correspond with the level of nursing assistance in basic functions (also called Average Daily Living scores).

103.    Thus, if a patient requires a high level of Average Daily Living ("ADL") nursing care, then that patient might also require a high level of rehab therapy.

104.    The five sub-categories vary in intensity, ranging from as low as 75 minutes per week at the Low RUG level, increasing up to 720 minutes or more per week at the Ultra-High level.

105.    The RUG level determines the amount of money per day that Medicare will pay for a patient's stay at the facility.

106.    Higher RUG levels command higher Medicare reimbursements.

107.    Assigning a patient to a particular RUG level requires a certain process.

108.    First, the patient must have a qualifying treatment, such as a three night overnight stay at a hospital.

109.    Second, a doctor must write an order for the patient to attend a nursing home facility, such as Riverside.

110.    Usually, a patient in need of rehab therapy is someone who, for example, breaks their hip.

111.    However, at Riverside, Defendants would admit patients suffering from other ailments – such as a stomach ulcer or scabies – and place them on rehab therapy.

112.    While the patients suffering from these conditions may have met the first two qualifications, a three night overnight hospital stay and a doctor's order, such patients should not be placed on rehab therapy if it does not reflect that patient's clinical needs.

113.    Defendants frequently placed these types of patients on Ultra High rehab therapy.

114.    Third, in most skilled nursing home facilities, a physical therapist examines the patient to determine if it is clinically appropriate to place the patient on rehab services.

115.    At the same time, a nurse is required to evaluate the patient and complete a minimum data set report ("MDS").

116.     An MDS is completed for each patient on several set days throughout their stay (specifically, the 5th, 14th, 30th, 60th, and 90th day).

117.     The MDS report includes the level of self-performance of the patient and the support that each patient needs with eating, bed mobility, toileting, and transfers.

118.     These four needs are referred to as ADL.

119.     A lower ADL score generally represents an independent resident, while a higher ADL score generally represents a totally dependent resident.

120.     The MDS, which includes the ADL score, reflects the level of therapy each patient receives.

121.     A patient with a high ADL score, meaning the patient is nearly entirely dependent on help and is a good candidate for rehab, might require ultra-high rehab therapy.

## V.     Applicable Laws on Kickbacks and Self-Referrals

122.     The Stark Act generally prohibits a physician (or their family members) from referring Medicare patients to entities in which the physician has a prohibited financial interest. *See* 42 U.S.C. § 1395nn(a)(1).

123.     For the purposes of the Stark Act, a financial interest is one in which the physician has an ownership or investment interest in the entity or has a compensation arrangement with the entity. *See id.* at § 1395nn(a)(2).

124.     Stark violations render the provider totally ineligible for compensation and therefore providers are not entitled to any reimbursement from the Government, even for services that are properly performed.

125.     The Anti-Kickback Statute prohibits any person or entity from offering or paying any remuneration to induce or reward any person for referring, recommending or arranging for

the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(g).

126.    The statute not only prohibits outright bribes and rebate schemes, but also prohibits offering inducements or rewards that has as one of its purposes to induce a physician to refer patients for services that will be reimbursed by a federal health care program.

127.    Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under Medicare.

128.    Accordingly, claims for reimbursement for inpatient or outpatient services under these programs that were the result of referrals tainted by kickbacks, are false claims and are not entitled to reimbursement.

## VI.    Defendants Engage in a Wide-Spread, Systematic, Corporate Kickback Scheme to Defraud Medicare.

129.    Defendants engage in an illegal scheme to provide doctors and case managers with cash, gifts, and numerous other incentives in return for patient referrals.

130.    Defendants also provide these incentives directly to patients to encourage patients to stay at the facility longer than necessary.

### a.    Corporate Defendants hire marketers to entice doctors and hospital case managers to refer Medicare patients to their facilities.

131.    In or around June 2013, Rechnitz hired Smith as a marketer for Riverside; Smith reported to Rechnitz and Robin.

132.    As a marketer, Smith's job was to get local doctors to refer Medicare patients to Riverside.

133.    Rechnitz hired Smith at a pay rate of approximately seventy eight dollars an hour, not including bonuses.

134.   Ayrapetyan told Orozco not to mess with Smith because Rechnitz hired her.

135.   When Rechnitz hired Smith, Riverside had only five Medicare patients.

136.   However about a year later, due to Smith's marketing efforts, Riverside had about twenty Medicare patients.

137.   As Smith proved how successful she was at getting doctors to refer Medicare patients, Rechnitz moved Smith to market for other facilities including Orange Healthcare, Mesa Verde and Santa Ana.

138.   Ultimately, Smith was promoted to Regional Business Director, along with Lyn Naivson to oversee all of the marketers at the various Rockport facilities.

139.   In July 2012, Robin promoted Admissions Director Leah Pennachio as the marketer for Riverside.

140.   Pennachio often used the company's Sam Club card, petty cash and her personal card to buy things for patients and case managers.

141.   In April 2013, Rhead hired Lane Marine to replace Pennachio as the marketer for Riverside.

142.   But Marine left after three months because she did not feel comfortable giving cash to doctors.

143.   After Marine, Smith hired Kristie Bednar as the marketer, but Bednar also left after a few months because she did not like Riverside's marketing practices.

144.   In August 2014, Smith hired Mario Pena as the marketer and he has remained in that position.

### b. Marketers spend significant amounts of money and create fake receipts.

145.    When Smith was first hired, Smith would submit her expense reports to the administrator, Rhead, to review and approve.

146.    A few months after Smith began submitting expense reports, the administrator, raised some concerns about how much money Smith was spending.

147.    Shortly after Rhead raised concerns, Robin told the Administrator that Smith could purchase what she wanted, and Robin would be reviewing and approving Smith's expense reports from then on.

148.    All of the marketers after Smith require pre-approval by Ayrapetyan to purchase items, or spend money.

149.    Once the marketer purchases the item, or pays for the event, the marketer submits an expense report to the administrator for review and then to Orozco for processing.

150.    Smith and Pennachio would create their own fake receipts for gifts purchased with cash to give to the doctors and case managers.

151.    Pennachio came up with the idea of creating a receipt indicating the cash was used to buy items like cupcakes or muffins for the patients.

152.    After Pennachio left, Ayrapetyan instructed Orozco to continue creating fake receipts to account for the cash the facility used for marketing gifts.

153.    After Pennachio, Riverside's marketers felt uncomfortable creating fake receipts, so Ayrapetyan, Desai, and Tillman told Orozco to create fake receipts indicating the cash was used to purchase items required by the patients such as wheel chairs, muffins, and cupcakes.

18

154.     In or around 2014, Ayrapetyan told Orozco to "get creative" for larger amounts because they could not justify so much money spent on wheelchairs as there were actually very few wheel chairs at Riverside.

155.     Smith's expense reports are still submitted directly to Robin.

156.     On one occasion, Pennachio purchased a laptop for Dr. Pengson on her husband's credit card and submitted an expense report requesting reimbursement for the purchase.

157.     Christy LNU, who worked for Rockport, questioned the purchase because she thought it was suspicious that the marketer was buying a laptop for a doctor.

158.     When Christy raised concerns about this purchase, Robin got involved, approved the expense report, and told Christy not to question the expense any more.

159.     Rockport's Accounts Payable Manager Cheryl Peterson ultimately fired Christy for asking too many questions about the expense reports submitted by the marketers.

### c.   Corporate Defendants provide doctors with cash, a salary, bonuses, hotels, and attractive women in exchange for referrals.

#### i.   Dr. Gamal Ghaly

160.     Dr. Gamal Ghaly is one of Riverside's medical directors who also has a private practice where he sees patients at Parkview Community Hospital.

161.     When Smith was Riverside's marketer, Smith would bring Dr. Ghaly in contact with the facility; Smith and Dr. Ghaly were very close.

162.     Riverside would pay for Dr. Ghaly's daughter's birthday parties, hotels, and anything else Dr. Ghaly needed.

163.     Dr. Ghaly refers a large number of Medicare beneficiaries to Riverside.

164.    In fact, according to Orozco, while Dr. Ghaly refers private insurance and long-term care patients to other facilities, including Citrus, Dr. Ghaly exclusively refers his Medicare patients to Riverside.

165.    Dr. Ghaly works at Riverside approximately one day a week to review and complete most of Riverside's patients' chart notes.

166.    In return for Dr. Ghaly's referrals, Riverside pays Dr. Ghaly a salary of $4,000 per month, a bonus based on how many referrals Dr. Ghaly provides, and takes Dr. Ghaly out for the evening to dinners and other social events.

167.    Riverside also pays for expensive gifts, parties, and other items for Dr. Ghaly.

168.    Riverside hires attractive young females to handle admission to entice Dr. Ghaly to continue to refer patients to Riverside.

169.    Smith and Ayrapetyan tell the admissions employees that they have to go out with Dr. Ghaly as part of their job duties.

170.    Smith and Ayrapetyan also tell the admissions employees that they have to pick up the tab for whatever Dr. Ghaly wants to do for the evening.

171.    The women in Admissions are told to pay in cash and bring in their receipts to be reimbursed for their expenditures.

172.    Sometimes it is the marketers, specifically Pena, who will take Dr. Ghaly out.

173.    When this happens, Pena pays for the events on his corporate credit card.

174.    As Smith rose higher up the chain, and took on more responsibilities, Pena was promoted to oversee Admissions and Marketing at Alta Vista.

175.    Pena instructs the Admissions employees at Alta Vista that they must go out with, and pay for, Dr. Ghaly as well.

176.   In August 2014, Riverside promoted Dinorah Hamilton to the position of Director of Admissions.

177.   Robin came to Riverside to speak with Hamilton and take her out to dinner.

178.   At dinner, Robin told Hamilton that in order to be Director of Admissions, she needed to go on dates with doctors.

179.   Robin then insisted that Hamilton drink more and offered her to stay at the same hotel that he was staying but Hamilton refused.

180.   After dinner, Hamilton called her former supervisor, Pennachio.

181.   Pennachio told her that if she could not handle it, to not take the position because that is what the position entailed.

182.   Hamilton went on dates with doctors but when things got out of hand, she complained to Tillman, the Administrator at the time.

183.   Tillman told Hamilton that she was naïve because she did not know what she had.

184.   Smith also personally called Hamilton and sent her text messages asking her to go on dates with doctors.

185.   In or around December 2014, Riverside demoted Hamilton to the position of Receptionist when Hamilton complained to Smith that Dr. Ghaly grabbed her butt when they were out one evening, and told Smith that she could only go out with Dr. Ghaly twice a week, and could no longer go out with Dr. Ghaly every night.

186.   Orozco also told Assistant Administrator Martindale that Dr. Ghaly grabbed Hamilton's butt while the two were out one night.

187.   Martindale brushed off Orozco's comment and said "he grabs everyone's ass. Just tell him not to and he won't do it again."

21

188.   After Smith demoted Hamilton, Pena paid for Hamilton's replacement, Rebecca Brizuela, to dye her hair blonde, as Dr. Ghaly prefers blondes.

### ii. Dr. Joel Pengson

189.   Dr. Joel Pengson is another medical director at Riverside who sees patients primarily at Parkview.

190.   In addition to his role as medical director, Dr. Pengson has traditionally referred Medicare beneficiaries to Riverside.

191.   Dr. Pengson is supposed to work at Riverside at least once a week, but usually only comes into the facility once a month.

192.   When Dr. Pengson is at Riverside, Dr. Pengson reviews and signs off on patient charts.

193.   In return for Dr. Pengson's referrals, Riverside pays Dr. Pengson a salary of $4,000, and a bonus based on how many referrals Dr. Pengson provides.

194.   Dr. Pengson has all but stopped referring his Medicare patients to Riverside, and now sends the majority of his Medicare patients to Mission Care Center, a skilled nursing facility owned by Sun Mar Management Services, where Riverside's former administrator Rhead currently works.

195.   Despite Dr. Pengson's diminished referrals, Riverside continues to pay Dr. Pengson his $4,000 a month salary as well as various perks for Dr. Pengson and his family.

196.   Riverside donates money to Dr. Pengson's charity, Christian Action for Reconciliation and Evangelism Philippines, and gives expensive gifts to Dr. Pengson's wife.

197.   Orozco recalls that one time, Dr. Pengson wanted an iMac desktop computer for his birthday, so Riverside's marketer at the time, Leah Pennaccio, bought him one.

198.   In addition to receiving gifts personally, the marketers give gifts to the doctors' wives.

199.   Smith and Dr. Pengson's wife are close friends and Smith often buys Mrs. Pengson designer sunglasses, purses, scarves, and electronics.

200.   Dr. Pengson and Dr. Ghaly also have charity fundraisers every year that Riverside donates money to.

### iii. Dr. Ghasan Tabel

201.   Dr. Ghasan Tabel is another medical director at Riverside who primarily sees patients at Parkview, and also works as Riverside's quality assurance director.

202.   Dr. Tabel has also all but stopped making referrals to Riverside, and hardly ever works at the facility anymore.

203.   Dr. Tabel usually just refers one to two patients a month and sends his nurse practitioner Linda LNU to come in briefly to check on the few patients he currently has at Riverside.

204.   Dr. Tabel has also requested that his long term care patients be sent to another facility, since Riverside no longer want to treat long term care patients.

205.   In return for Dr. Tabel's referrals, Riverside used to pay Dr. Tabel a salary of $4,000 a month, but now only pays Dr. Tabel a salary of $2,000 a month, and a bonus based on how many referrals Dr. Tabel provides.

206.   Patients are usually assigned to whichever doctor referred the patient.

207.   As a result, the majority of Riverside's patients are seen by Dr. Tabel, who refers the most patients.

208.    The doctors are given bonuses if their referrals help Riverside in meeting its internal Medicare enrollment goal.

209.    Cash bonuses given by marketers and approved by Ayrapetyan as ultimately all gifts given to doctors, and expensed by the marketers have to be approved by Robin.

210.    In addition to the salaries, cash bonuses, drinks, dinners, parties, and charity contributions Riverside pays to the doctors, Riverside also pays for the doctor's hotel rooms, limo service to special events, dry cleaning, golf outings, laptops, car washes, and valet services among other items, services, and goods.

211.    Orozco states that Riverside pays for everything for these doctors on top of the salary that Riverside pays the doctors for acting as Medical Directors.

### d. Corporate Defendants provide hospital case managers with gift cards, cash, and gift baskets in exchange for patient referrals.

212.    Case managers at hospitals and other medical facilities are supposed to present a list of options of skilled nursing facilities to the patient or the patient's family, and ask the patient and family to make a decision about what skilled nursing facility the patient would like to go to.

213.    The case managers that work with Rockport's marketers do not present a choice to the patient or the patient's family and instead tell the patient that they have been told they need skilled nursing care and so they will have to go to Riverside, or one of the other Rockport facilities.

214.    Parkview Community Hospital is located behind Riverside's parking lot; Riverside Community Hospital and Riverside Medical Center are also located nearby.

215.    Marketers from Riverside used to bring gift cards and gift baskets to the case managers at Parkview and Riverside Community Hospital, Riverside Medical Center and Kaiser in Moreno Valley and Riverside.

24

216. At Riverside daily meetings, Ayrapetyan, Romney, Rhead, and Desai would instruct Perez, Pennachio, Kellen Vasquez and Orozco to go to Sam's Club and purchase large quantities of gift cards, between $500 and $1,000, for the marketers to give out for referrals.

217. Other times, when Orozco would go to Sam's Club to get office supplies for Riverside, Ayrapetyan, Rhead, and Desai would ask Orozco to purchase gift cards and bottles of wine for the marketers to give to case managers.

218. When Sam's Club stopped selling gift cards, Ayrapetyan, Rhead, and Desai would instruct Perez, Orozco and the marketers to purchase gift cards from Staters brothers.

219. Ayrapetyan, Rhead, and Desai instructed Perez, Orozco, and the marketers to always buy the gift cards in cash so Riverside could write the expense off as purchase for patient related items such as wheel chairs or cupcakes.

220. The gift cards the marketers would bring the case managers were often generic Visa or MasterCard gift cards, and some were for specific business such as Starbucks; the gift cards ranged in value from $25 to $250.

221. Ayrapetyan, Rhead, and Desai also instructed Perez to purchase groceries from Sam's Club for doctors and case managers providing referrals.

222. When the marketer went to Parkview, the marketer would drop off the gift basket and say something to the effect of, "this is for you, from us."

223. Or, the marketer would ask to speak with Sandra, Michelle, JC, Janell, Andrew, Mel, Myline, Sammy and Faith.

224. When the marketer went to Riverside County Regional Medical Center, the marketer would ask to speak with Lyn, Debbie, Mayra Gallegos (Gallegos worked at Alta Vista and now works at Parkview).

225.    Lyn would often make deals with Pena in exchange for Medicare patients.

226.    It was primarily the marketer's job to bring gifts to Parkview, and if they were busy, sometimes the Admissions staff would bring the gifts to Parkview.

227.    Occasionally, if the marketers and Admissions staff were busy, Ayrapetyan would tell Orozco to walk over to Parkview and give gifts to the case managers.

228.    In or around 2013, Smith came to Riverside and told the marketers that they were no longer allowed to go over to Parkview as there had been complaints of bribery at Parkview.

229.    Smith instructed Riverside's marketer to schedule a specific time on Wednesdays to go to Parkview to meet with the case managers.

230.    Smith told the marketers that to avoid issues at Parkview the marketer should go over to Parkview and ask the case managers out to dinner or happy hour with the marketers.

231.    Once the marketers were out to dinner or drinks with the case managers, the marketer would give the case manager the gift cards, or other gifts.

232.    Robin and Smith tell the marketers that they should take the case manager out to dinner or give the case manager a gift card for every single Medicare patient the case manager refers to Riverside.

233.    Riverside marketers always paid for the dinners and happy hours they treated the case managers to.

234.    The marketers take the case managers and doctors to Sevillas in Riverside and Mission Inn in Riverside for dinner and happy hours amongst other places.

235.    The marketers at Riverside also gave gifts and threw happy hours for almost every single holiday, like St. Patrick's Day.

236.    For Christmas, Riverside's marketers would give larger gifts like Chanel make-up sets for the women and shaving kits for the men.

237.    Recently, Smith instructed the women working in Admissions at Riverside to take the female case managers to the spa.

238.    More expensive gifts, such as purses, are given to case managers by Riverside's marketers to "motivate" them to provide more referrals.

239.    Smith would often submit expense reports with name brand purses listed.

240.    On one occasion, Orozco remembers Smith submitted an expense report with a $3,000 name brand purse for a case manager.

241.    Smith told Orozco to list the purse as "Director of Nursing's Birthday" even though Orozco knew that the Director of Nursing's birthday was months away.

242.    Smith instructed Orozco to expense the purse this way because if the expense is attributable to an employee, Riverside can code the expense as an employee benefit, and there is nothing to say an employer cannot give their own employee a gift.

243.    When Orozco saw this expense, Orozco made a comment to Rhead, the Administrator at the time, that the purse Smith bought was more than Orozco made in a month.

244.    Rhead responded "we make $18,000 a month from Medicare patients."

245.    After this comment, Orozco never complained about the marketer's expense reports again.

246.    Parkview's Director of Case Management, George Martindale was aware of, and participated in, Riverside's practice of giving kickbacks to Parkview's case managers for referrals.

247.    Martindale has gone out to dinner and drinks on numerous occasions with Riverside's marketers.

248.    In 2015, Martindale went to Mari Gras in New Orleans with Smith.

249.    In or around March 2014, Martindale also used his connection as a referral source to get his son, Garrette a position as Assistant Administrator so Garrette could complete his clinical administrator training.

### e. Defendants provide patients with gifts, food, and waive certain costs to persuade them to stay at the facility as long as possible.

250.    Defendants engage in a companywide, systematic scheme to keep patients on service for the 100-day maximum for which Medicare will pay for rehabilitation services.

251.    Rhead and Desai told Riverside staff to do whatever it takes to ensure that Medicare patients remain at the facility.

252.    Ayrapetyan, Rhead, Tillman, Desai, and the rest of Riverside staff, bribed patients who wanted to leave Riverside to stay at Riverside with promises of special food from restaurants, new televisions, shopping trips, rental payments, and other perks.

253.    If a patient wants to leave, the staff is required to send an email to Ayrapetyan and Ayrapetyan will call one of the administrators and tell them to do whatever it takes to keep them at Riverside.

### i. Defendants do not attempt to collect the 20% cost share required by Medicare.

254.    Medicare requires that recipients cover uncovered charges ("shared costs") before it will reimburse facilities for the cost of care.

255.    If the stay is for fewer than 20 days, there is no shared costs requirement.

256.    It is common for Riverside to waive the required 20% shared costs for rehabilitation services provided to Medicare beneficiaries.

257.    If a patient at Riverside receives social security checks, Riverside will deposit the monthly check in the patient's trust account.

258.    Riverside then transfers money from the patient's trust account to Riverside's main bank account, and posts that transaction to the patient's account to show Medicare that the patient paid the required 20% to Riverside.

259.    Even though Riverside completes this transaction, Riverside reimbursed most Medicare patients with cash or checks made out to the patient personally.

260.    In or about October 2014, when Campbell was serving as Interim Administrator at Riverside, Orozco attempted to collect coinsurance from a Medicare patient.

261.    When Campbell learned this, Campbell went to Orozco's office and said "we don't collect on Medicare."

262.    Orozco visited other Rockport facilities, including Orange and Skyline, and saw the accounting books which indicated to Orozco that all three other facilities implement the same strategy of waiving the 20% shared costs.

263.    Orozco also spoke with the Business Office Managers at Orange and Bakersville who told her that Ayrapetyan's instructed them not to collect on Medicare patients.

264.    Orozco knows this is true because the books at all the facilities have an "outstanding" note next to all of the Medicare patients.

265.    A previous biller, Susan Rhea, complained to Rhead and Desai that when she tried to collect from patients after they were released, the patients would often tell her that Riverside  told them they would not have to pay anything.

266. Rhea had been at Riverside for sixteen years but ultimately left because Riverside was pressuring her to collect on 100% of its accounts.

267. Depending on the case, the Administrator would put an administrative hold on the patient's account, and stop collection efforts.

268. On one occasion, when Orozco was first promoted to biller, Orozco was working on an accounts receivable project, and noticed that Rhea had placed an administrative hold on a number of accounts.

269. When Orozco asked Ayrapetyan about the administrative hold, Ayrapetyan told Orozco that administrative holds are placed on patient accounts for whom Riverside is not collecting the 20% shared costs.

270. In or about September 2014, when Orozco asked why Riverside does not collect the 20% shared costs from these patients, Ayrapetyan replied "What's $152 a day when you're making $700 a day on the patient?"

271. Ayrapetyan, and Martindale who was also present, laughed at the comment.

272. During the time Orozco was Riverside's biller, Ayrapetyan instructed Orozco to not contact Medicare patients for shared costs or coinsurance until after they left the facility.

273. Once the patient left Riverside, Orozco was to make notes in the patient's file representing Riverside's collection efforts.

274. Ayrapetyan told Orozco to make minimal effort for collection of Medicare patients and that Riverside would just write the costs off.

### 1. Riverside and Dr. Ghaly told patients that Riverside would not require them to pay their 20% share of costs.

275.    Dr. Ghaly, a doctor who works as a staff physician at nearby Parkview Community Hospital, would tell Medicare patients that Riverside would not charge them for the shared costs.

276.    Assistant Administrator at Riverside, Garrette Martindale, would also tell Medicare patients that Riverside would not charge them for their share of costs.

277.    Martindale would give the patients cash or checks.

278.    However, patients who want to leave Riverside are discouraged from leaving Riverside by being told that if the patient leaves they will be personally responsible for paying the entire cost of their stay at Riverside.

279.    Orozco recalls one instance, in or around August 2014, where a patient, Mr. E, was approved to receive 100 days of rehabilitative care at Riverside.

### 2. Specific Examples

#### a. Mr. E.[3]

280.    When Mr. E arrived at Riverside, Mr. E was told by Pena, Dr. Ghaly, and Martindale that he would only have to stay at Riverside for one month.

281.    Mr. E was concerned because Mr. E's wife relied on his social security check.

282.    Dr. Ghaly and Garrette Martindale informed Mr. E that because he and his wife both relied on his social security check, Mr. E would not be responsible for the shared cost that he would otherwise be required to pay as a Medi-Cal beneficiary.

283.    Mr. E spoke with Orozco about not paying the share of costs and Orozco replied that she knew nothing about waiving the shared costs.

---

[3]Patient names are abbreviated to maintain confidentiality.

284. Mr. E complained to Martindale, Martindale told Orozco that Dr. Ghaly had told Mr. E that he would not have to pay shared costs for his care at Riverside.

285. Because Dr. Ghaly, Martindale and Smith told Mr. E that he did not have to share the cost of his care at Riverside, Mr. E paid for his share of costs but then Riverside provided Mr. E a check for $1,300 to reimburse him. .

286. Because Riverside reimbursed Mr. E after his first month at Riverside, Mr. E was convinced to stay for a second month.

287. Riverside reimbursed Mr. E's social security check to him after the second month of his stay.

288. At the end of the third month, when Mr. E was discharged, Riverside kept Mr. E's social security check to recoup some of the cost sharing Mr. E should have been responsible for, despite Riverside telling Mr. E that they would not collect the shared costs.

**b. L.D.**

289. On another occasion, in or around July 2014, Orozco recalls contacting the son of patient L.D. by repeatedly calling him.

290. When the patient's son answered, the son told Orozco that Desai said his father did not have to pay the shared costs if he stayed at Riverside for two weeks.

291. Orozco told Ayrapetyan about the son's claims, who in turn emailed Desai.

292. Desai emailed Orozco back and told her that he did agree to waive L.D.'s shared costs if L.D. stayed at Riverside for 2 weeks.

**c. G.W.**

293. Orozco also attempted to collect shared costs from patient G.W.

294.    Every time Orozco called G.W., Orozco would speak with G.W.'s daughter who informed Orozco that Dr. Ghaly told G.W. she would not have to pay anything to stay at Riverside.

295.    When Orozco raised this with her managers, Ayrapetyan told Orozco not to collect any shared costs from G.W.

### 3.  Riverside did not waive costs for Medi-Cal patients.

296.    While instructing Orozco and other Riverside staff to not collect shared costs from Medicare patients, Ayrapetyan simultaneously told the staff to collect all shared cost payments from Medi-Cal beneficiaries.

297.    Despite waiving the shared costs for Medicare patients, Riverside routinely tells Medi-Cal that the patient has paid their share of cost in order to receive coinsurance payment from Medi-Cal.

298.    Aryapetyan instructed the staff to collect shared costs from all Medi-Cal beneficiaries because Medi-Cal only pays $200.16 per day for a patient's stay at Riverside, and the facility wants to recoup as much money as possible for Medi-Cal patients.

299.    One patient in particular, D.J., a Medi-Cal patient, frequently complained to the staff and to the State of California that he felt discriminated against because of his health insurance.

300.    D.Y. complained that Riverside tried to evict him but treated Medicare patients very well.

### 4.  Falsifying records related to patients' share of costs.

301.    Every year, Medi-Cal and Medicare conducts an audit.

302.     When Riverside is audited, the company simply creates fake receipts to indicate that the patient did pay the 20% coinsurance and share of cost.

303.     Prior to the audit, Rockport sends Utilization Consultant Gina Galang to prepare for the audit.

304.     Prior to this audit, Tillman, Riverside's Administrator at the time, told Orozco to make sure "everything was covered."

305.     When Orozco told Tillman that she would not be able to demonstrate that Riverside had collected the share of cost from Medi-Cal patients to clear their benefits, Tillman bought Orozco a receipt book and told Orozco to begin writing fake entries indicating that the patient did pay the shared cost.

306.     Orozco would make fake receipts either in a blank receipt book that was kept in Orozco's office for the sole purpose of creating fake receipts, or Orozco would be instructed to make fake receipts in Microsoft Word.

### ii. Corporate Defendants pay patients' rents to keep them in the facility.

307.     In or around 2014, a patient drove himself to Riverside, and when he arrived, he informed admissions that Dr. Ghaly told him that he needed rehabilitation, and that Riverside would "help with the rent."

308.     Patient D.N. also drove herself to Riverside in or around 2013.

309.     When D.N.'s 100 Medicare days were up, Ayrapetyan instructed Orozco to give D.N. cash and instructed Desai to pay for a hotel room for D.N. for a month.

310.     Orozco has witnessed some patients being enticed to stay at Riverside by Riverside staff telling the patients that Riverside would pay the rent for their apartments if they stayed.

311.    Specifically, Orozco has witnessed Martindale, Campbell, and Ayrapetyan make this promise to patients.

312.    One patient, R.V. lived in Section 8 subsidized housing, and would have lost the subsidy if he stayed at Riverside for more than one month.

313.    Because of this, R.S. kept trying to leave Riverside to ensure that his home would not be taken away.

314.    Tillman and Riverside's marketer at the time, Pena told R.V. not to worry about losing his house that they would pay the rent for R.V. to ensure he kept his Section 8 subsidized housing.

315.    Another patient who lived in Section 8 subsidized housing was R.S.

316.    R.S. was admitted to Riverside with scabies and told by Dr. Ghaly that he would only need to stay at Riverside for three days.

317.    However, at the end of the three days, Dr. Ghaly told R.S. that he needed to stay at Riverside another week.

318.    Ultimately Dr. Ghaly told R.S. that he had to stay at Riverside for three weeks.

319.    Because R.S. had scabies, Riverside billed for R.S.'s stay under the "isolation" code, which is billed at $1,000 per day.

320.    Riverside billed that R.S. was in isolation even though R.S. refused to stay in isolation conditions and would often leave his room to walk around the facility.

321.    During R.S.'s stay, R.S. received therapy, although Orozco is unsure what kind of therapy R.S. needed since his only diagnosis was scabies.

322.    Concerned about his housing, R.S. was getting increasingly frustrated with Dr. Ghaly and Riverside.

323.    To calm R.S. down, and keep R.S. as a patient at Riverside, Tillman offered to write a letter to the state to ensure R.S. would keep his Section 8 subsidized housing even if R.S. remained at Riverside for an extended period of time.

324.    R.S. became so frustrated with Riverside that he ultimately packed his belongings and left Riverside.

325.    Riverside, through its administrators, Aryapetyan, and Robin, also induces homeless patients to stay at Riverside for the 100 day maximum by offering to pay for a motel room for the patient, once the patient is discharged from Riverside, and work to get the patient into long-term housing.

326.    When the homeless patients were discharged, Rhead, Martindale, Desai, Pennachio or Ayrapetyan would go to a low quality motel, pay for one month's rent in cash, and then make no further attempt to assist the patient in obtaining long-term housing.

327.    Orozco knows that Rhead, Martindale, Desai, Pennachio and Ayrapetyan would do this because Orozco was in charge of the petty cash about would have to give the cash to whoever was paying the motel.

328.    Ayrapetyan instructed Orozco to indicate in the records that the cash was used to purchase wheel chairs.

### iii.   Riverside pays cash to some patients to induce them to stay at the facility.

329.    In addition to paying rent for some patients, Riverside, and the other facilities Ayrapetyan oversees offers some patients, or the patients' family members, cash to induce the patient to stay at Riverside for the 100 day maximum.

330.    Orozco knows that this same practice of inducing patients to stay at the facility by offering to pay the patient or the patient's family cash also occurs at all of the other facilities

Ayrapetyan oversees as well as Santa Ana, another facility owned by Shlomo where Smith and Martindale currently work.

331.    Orozco recalls one patient, S.A. whose daughter was a drug addict.

332.    S.A.'s daughter wanted to take S.A. out of Riverside because S.A. was the daughter's representative payee for social security purposes.

333.    Desai and Martindale agreed to pay the daughter $50 a day to keep S.A. in Riverside.

334.    On another occasion, a patient B.C. walked out of Riverside and went home because he was frustrated with having to stay at Riverside, and because he was confused.

335.    On the evening B.C. left Riverside, the Charge Nurse contacted the Director of Nursing at the time, Elphete Zapanta and told Zapanta about B.C. leaving.

336.    Zapanta told the charge nurse to find B.C. and bring him back.

337.    Based on this instruction, the charge nurse sent to Certified Nursing Assistants ("CNA") to look for B.C.

338.    When the CNAs found the B.C. wandering around, they offered to pay him cash to come back to Riverside.

339.    Orozco recalls another patient the staff referred to as Mr. Corona (not his real name), who was a drug addict who left Riverside to do drugs.

340.    At the daily meeting, it was brought to Ayrapetyan and Robin's attention that Mr. Corona left the facility to seek, and use, drugs.

341.    Upon hearing this, Ayrapetyan and Robin told the staff that they needed to get Mr. Corona back.

342.    One of the marketers at the time, Pena, spent the day looking for Mr. Corona and ultimately found him.

343.    Pena offered to give Mr. Corona money if Mr. Corona went back to Riverside with Pena.

344.    Riverside would also pay for cab rides for family members to come visit patients at Riverside.

345.    But if a patient's insurance switched from Medicare to Medi-Cal, Riverside would stop paying for the cab rides.

346.    On one occasion, Dr. Ghaly told R.S., whose wife was at a different hospital, that if R.S. stayed at Riverside, Riverside would allow, and pay for R.S. to visit his wife.

347.    Orozco knows that this practice of paying for a patient's or their family's cab rides occurs at Orange Healthcare as well.

### iv. Riverside unnecessarily admitted Orozco's mother into the facility for rehab treatment.

348.    In or around July 2013, Orozco took her mother, M.C., a Medicare beneficiary at the time, for a routine checkup with Dr. Ghaly.

349.    When Orozco dropped her mother off at the office, Orozco told her mother to call when she needed to be picked up.

350.    During M.C.'s visit, Dr. Ghaly told M.C. that she needed to go to the hospital.

351.    Based on this instruction, Orozco took her mother to Parkview Community Hospital and again waited for her mother.

352.    After approximately four hours of waiting, Orozco went into Parkview to check on her mother.

353.    Dr. Ghaly had admitted M.C. to the hospital and M.C. was not discharged for three days, which was a qualifying stay under Medicare's regulations.

354.    While at Parkview, Dr. Ghaly encouraged M.C. to go to Riverside for rehabilitation therapy even though it was unclear what M.C. required skilled nursing care, or rehabilitation for.

355.    Because M.C. was Orozco's child care provider at the time, Riverside's Administrator at the time, Rhead, and Ayrapetyan offered to hire a babysitter for Orozco for two weeks while M.C. stayed at Riverside.

356.    Additionally, Rhead requested, and Ayrapetyan approved, $600 to pay toward M.C.'s plane ticket to travel to Nicaragua to visit family after she was released.

357.    M.C. was only in the hospital for three days, for an unknown reason, was not put on any medication, and did not require rehabilitation.

358.    While M.C. was at Riverside, Dr. Ghaly would avoid Orozco so as to not have to discuss M.C.'s medical condition.

359.    At the time, Orozco did not have access to patient's medical records or charts and therefore could not see why her mother had been admitted to Riverside.

360.    While at Riverside, M.C. did complain about knee pain, and received physical therapy.

361.    When it came time to discharge M.C. from Riverside, M.C. requested a prescription for pain medication for her knee.

362.    However, because Dr. Ghaly never evaluated M.C. for knee pain, and did not prescribe any pain medication for M.C., Riversides discharge nurse told M.C. she could not receive a prescription for medication, but rather that she should take some vitamins.

363.    Upon leaving Riverside, M.C. went to another doctor who diagnosed M.C. with knee problems, and wrote M.C. a prescription for her knee pain.

364.    M.C. stayed at Riverside for two weeks, as Dr. Ghaly recommended.

### v. Riverside purchases specialty items for patients to keep them at the facility.

365.    When a patient indicates that they want to leave Riverside before their Medicare approved service is up, Riverside's marketers, administrators, Ayrapetyan, and Robin instruct Riverside's nurses to tell the patient that Riverside will buy them whatever they want if the patients stays for the entire time approved by Medicare.

366.    Orozco recalls one Medicare patient, Mr. R.B that did not really need therapy but was approved by Medicare to receive a high level of therapy.

367.    Mr. R.B told his nurse, J.R. that he wanted to leave Riverside and was going to leave if Riverside didn't give him $5.00.

368.    J.R. went to Tillman to ask for $5.00 to give Mr. R.B, however, Tillman was not in the office at the time, so J.R. asked Orozco for $5.00 from the petty cash.

369.    Even after Mr. R.B left Riverside, he would keep coming back to the facility to ask for money, but Orozco would refuse to give Mr. R.B money.

370.    In some instances, Riverside has purchased new televisions for patients that the patient can take home.

371.    One patient, Mr. G., was brought to Riverside from Riverside Community Hospital and did not want to stay at Riverside.

372.    At one of the daily meetings, it was reported that Mr. G. did not want to stay at Riverside.

373. Later that day, when Orozco asked Pena if he spoke with Mr. G, Pena responded "Yea, we took care of it" and smiled at Orozco.

374. Later that day when Orozco went to Mr. G's room to speak with Mr. G, Orozco saw that Mr. G had a large, 40 inch television set in his room, when Riverside's rooms only have 19 inch television screens.

375. Orozco knows that Ayrapetyan approved the television Pena purchased for Mr. G because the television was listed on Pena's expense report

376. In other instances, Riverside would pay to have food delivered from a patient's favorite restaurant to persuade the patient to stay.

377. If a patient wanted a special food order, the administrators would take the patient's order and then tell Perez to go and pick up the food for the patient. According to Orozco this was a pretty regular occurrence at Riverside.

378. Orozco recalls one patient, G.J. who liked to collect should and often order shoes from the East Bay Magazine to be delivered to Riverside.

379. At some point during G.J.'s stay, some of the staff members started complaining that G.J.'s shoes were taking up too much room.

380. When confronted about his shoes, G.J. told Desai that if he did not have his shoes, he would leave Riverside.

381. In response, Desai acquiesced to letting G.J. keep all of his pairs of shoes at the facility, and took G.J. to the mall to purchase more pairs of shoes.

### vi. Riverside allowed Medicare patients to use drugs in the facility.

382. One Medicare patient, M.D., was known as a troublemaker, so Riverside paid her to leave the facility, paid for her hotel and reimbursed her for her share of costs.

41

383.    While M.D. was at Riverside, she often used drugs at the facility.

384.    Under Riverside's policies, it was supposed to discharge patients if the patients were using drugs on the facility.

385.    When Riverside management or staff saw Medicare patients using drugs, they would ignore the problem.

386.    One night, Orozco saw patients smoking weed outside of the facility.

387.    Orozco told Registered Nurse Supervisor (PM shift) Adam Lomarda but he said there's nothing she can do.

388.    Orozco then told Rhead, who did nothing in response to her complaint.

389.    At a later point, Orozco found a spoon and a lighter in a patient's room, which is usually used for heroin use.

390.    Orozco told Rhead about the spoon and lighter, but Rhead told her that she could not assume that the patients were using drugs.

## VII.    Defendants Knowingly Present False Claims for Payment or Approval to Medicare.

391.    Defendants knowingly present false claims or cause to present a false or fraudulent claim for payment or approval to Medicare by: assigning nearly all of its Medicare patients to rehab therapy (unnecessary services); placing almost all of its Medicare patients on the highest and costliest forms of rehab therapy (upcoding); failing to provide services for which they billed; and extending nursing stays (unnecessary services).

392.    Ayrapetyan instructs all therapists and doctors to assign Ultra High (RUx) RUG levels for patients' rehab therapy.

393.    This is so each patient is approved for the maximum amount of therapy.

### a. Riverside nurses do not adequately assess patients.

394.   When a patient is admitted to Riverside, the patient should be assessed by the Director of Nursing and then be assessed by one of the therapists to determine whether or not the patient also needs therapy.

395.   The doctor is then supposed assess the patient within five days of being admitted to ensure the patient needs skilled nursing care and sign off on all of the patient's orders.

396.   The doctors at Riverside do not usually come to assess the patient within the first five days of the patients stay resulting in unsigned or forged paperwork.

397.   If the patient is admitted is a Medicare patient then the therapist is always supposed to indicate that the patients need Physical Therapy ("PT"), Occupational Therapy ("OT"), and Speech Therapy ("ST") every day.

398.   After a patient has been at the facility for five days, the MDS Nurse is supposed to complete the MDS assessment questionnaire online for the patient.

399.   The MDS score correlates with the RUG level that the patient should be assigned.

400.   The MDS questionnaire is completed by filling out information in the patient's chart as entered daily by therapy and the nursing staff.

401.   The information is then supposed to be reviewed by the MDS Nurse prior to being entered into the MDS questionnaire.

402.   At Riverside, the licensed nurses do not chart on the patients every day like they are supposed to, but rather one charge nurse, Mayra Gallegos is responsible for charting on every single patient in the facility every single day.

403.    Given the copious amount of work this requires, Gallegos often copies chart notes from previous days or other patients to save time.

404.    At Riverside, the MDS nurse, Licup, does not review the chart notes of the patient's assessment, and simply enters exactly what is written in the patient's chart into the MDS questionnaire.

405.    Since Gallegos is making up chart notes, Licup enters incorrect, made up information into the MDS questionnaire for patients.

### b. Riverside falsely inflates patients' diagnoses.

406.    If a patient comes into Riverside for a minor issue, for example, to get an IV, or for scabies, Riverside will inflate the patient's diagnosis code in order to bill for some type of therapy.

407.    The intake nurse or the doctor is responsible for assessing the patient and determining what the appropriate diagnosis code is for the patient.

408.    Orozco as Riverside's biller was required to bill for whatever diagnosis is marked in the patient's chart because Orozco is not a nurse or doctor and cannot examine the patient to determine the patient's diagnosis code.

409.    Sometimes the nurses at Riverside will not enter any diagnosis codes on the patients chart.

410.    If this happened, Ayrapetyan and the Administrators instructed Orozco to enter the first five codes available on the chart.

411.    When the Medical Records Consultant, Gina Galang, saw that the nurses were not entering diagnosis code, Rivera instructed the nursing staff that the MDS nurse is supposed to assign the diagnosis code and enter the primary and secondary diagnosis codes into the computer

system, at which point Orozco is supposed to enter the diagnosis codes from the computer system into the billing system.

412.    Every month, Orozco is supposed to meet with the MDS nurse, who at the time, was Lindsey Licup, for a "triple check" meeting where the MDS nurse would verify each patient's diagnosis and chart was correct.

413.    For a long time, Licup would not participate in the triple check meetings.

414.    When Orozco was promoted to biller in or around June 2014, Orozco required Licup to be at all triple check meetings.

### c. Riverside assigns nearly all of its Medicare patients to rehab therapy and places them on the highest level of therapy possible.

415.    As described above, many of Riversides patients are not appropriate candidates for rehabilitation because they can independently drive themselves to the facility, can leave under their own power, or in the case of M.C., have no medical condition that would require rehabilitation.

416.    Riverside's therapists, per Ayrapetyan's instructions, keep patients' RUG levels consistent throughout their time, suggesting no improvement despite intensive therapy.

417.    Riversides' therapy services are subcontracted through Integral Rehabilitation.

418.    Integral Rehabilitation's managing therapist at Riverside used to be Sandy Avendano, who was uncomfortable lying about a patient's therapy requirements or health status.

419.    When a patient was fully rehabilitated, Avendano would send an email to Aryapetyan stating that the patient had completed all their physical therapy and that it was to release that patient from Riverside.

420.    In response to Avendano's email, Aryapetyan would ask Avendano how many Medicare days the patient had left.

421.    If the patient had more Medicare approved days left, Ayrapetyan would tell Avendano "no" and to extend the patient's therapy plan.

422.    Ayrapetyan sent these emails to the therapists daily.

423.    Avendano found this difficult to do because often times the patients were fully rehabilitated and there was no additional service the therapists could offer the patient.

424.    In or around November 2014, Avendano was promoted within Integral Rehabilitation, and Chris DeVera was hired to director of rehabilitation at Riverside.

425.    DeVera had no problems following Ayrapetyan's directions to lie about a patient's therapy needs, or extend the patient's therapy plan to extend the patients stay.

426.    Licup would often tell the therapists that if a patient was receiving the highest level of therapy services, the therapist would have to show some consistent progress in their patient notes as it would look suspicious to say a patient was declining, or not improving, for ninety nine days and then say the patient is fully recovered on day 100.

427.    In response to Licup's charting concerns, DeVera said, "I'm just doing what Aneta told me."

428.    Completing the MDS assessment to obtain the highest RUG level, and keeping patients on therapy for the entire length of their approved stay is the standard operating procedure at all of the facilities Ayrapetyan oversees.

**d. Riverside fails to provide the services for which it billed.**

429.    Ayrapetyan and Tillman instructed therapists to continue to bill for rehabilitation services even when the patient does not want to participate.

430.    In instances where a patient does not want to participate in rehabilitation, the therapists are told to sit in the patient's room with the patient for forty-five minutes and bill for the services.

431.    The therapists are instructed to document this time with the patient as if they had performed services.

432.    If a therapist mentioned during Riverside's daily meeting that the patient does not want to participate in therapy, the administrator would say something to the effect of "well make them be compliant, or I will make them be compliant."

433.    To get the patient to be compliant with therapy, Tillman would go to the patient's room and say "hey, why don't you come take a walk with me" and Tillman and the patient would walk around facility and talk.

434.    At the end of the walk Tillman would go to the therapist and tell the therapist to document the walk as that day's therapy for the patient

435.    One patient in particular, M.S. weighed close to 600 pounds and did not want to get out of bed, or participate in therapy at all.

436.    The therapist would come to M.S.'s bed, and give him little bar bells and make him do ten curls.

437.    This was considered his therapy for the day despite the fact the M.M.C. was approved for, and being billed for the highest RUG level.

438.    In some cases, when a patient did not want to participate in rehabilitation, the therapist would indicate that the patient was "extremely weak."

439.    Orozco would later observe this same patient pushing other patients around the facility in a wheel chair.

440. One patient Mr. R would often not participate in rehabilitation but would often push around a fellow patient, J.L.

## VIII. Defendants Submit False Records or Statements Material to False Claims.

### a. Doctors refuse to maintain accurate records; staff forges doctors' signatures.

441. Riverside maintains a protocol that requires all doctors to sign in and record the patients they examine when they work at the facility.

442. Riverside created this protocol because family members of Riverside patients were complaining to the staff that the doctors were never coming to see their relatives.

443. Riverside wanted to be able to show the patients' family members that the doctors were coming to see the patients regularly.

444. Additionally, Riverside wanted to keep records of care to justify the services being billed to Medicare.

445. The doctors at Riverside refused to sign in or record which patients they examined on the log.

446. Medicare requires the patient's doctor to see the patient upon admission and document why the patient is appropriate for the patient.

447. Dr. Pengson would not come to Riverside to see a patient until he had to sign paperwork for the patient.

448. Medicare requires signatures on all medical orders and records.

449. A facility is not allowed to bill until all of the required paperwork is signed by the patient's doctor.

450. At Riverside, sometimes the doctors would not sign all of the paperwork required.

451.    Orozco recalls one occasion in or around 2013 when Dr. Pengson traveled to Europe for approximately two weeks.

452.    During this time Dr. Pengson could not, and did not, sign any medical records or documents for his patients.

453.    When the doctors do not sign patient records, like when Dr. Pengson was in Europe, Medical Records Director Carol Manly instructed Riverside staff to forge the doctor's signature and date the document as if the doctor signed it.

454.    According to Orozco, auditors have asked Riverside about the inconsistencies of handwriting or ink between the signature and the date on certain patient documents.

455.    When an RN Supervisor complained about the paperwork and the doctors refusal to complete their patient log to Medical Records Consultant Jonalyn Rivera, Robin told the staff to ignore the rule, and let the doctors continue to do what they were doing.

456.    Robin told staff that the doctors were allowed to do whatever they wanted and if the doctors were upset, people would be fired.

457.    Robin told Orozco specifically, "do not mess with the doctors."

**b.    Riverside management directs its staff to alter paperwork related to bed-hold orders.**

458.    When a rehab on Medi-Cal has to go to the hospital, the facility, in this case, Riverside, is required to hold the bed for seven days, and bill at a lower rate of $185 per day.

459.    Because the doctors do not come to Riverside very often, many times the nurses have to sign the bed-hold orders as if they were the doctors.

460.    Orozco knows that other facilities under Ayrapetyan did this too.

461.    Every year, the State performs an annual Medi-Cal audit where each facility has to supply the bed-hold orders the doctors issued throughout the year.

462.     At Riverside, Manly and Rivera would review all the bed-hold orders prior to the audit, and have the doctors sign the bed-hold orders, or have the nurses sign the doctor's name.

463.     Sometimes Riverside would not even have a bed-hold order for a patient who required one, so the nurses would have to create one.

464.     Any time Medicare requests documents for an audit, Ayrapetyan has Rivera look over the documents, and sign for the doctors, or complete missing documentation.

### c.  Riverside management directs its staff to falsify their signatures and timesheets so that Riverside is compliance with state-required staffing levels.

465.     Skilled nursing facilities such as Riverside, and the other Rockport facilities, are required to meet certain staffing requirements based on the number of patients in the facility, called "PPD" requirements. For example, a Certified Nursing Assistant cannot be responsible for any more than eight patients at a given time.

466.     Whenever Riverside has a staffing audit, managers are asked  to falsify employee signatures and time sheets to represent that Riverside is in compliance with the state-required staffing levels.

467.     Because of this payroll falsification, nurses will often be paid for hours they do not work.

### d.  Riverside instructs its employees to pretend to be Medicare patients to ensure that benefits continue.

468.     A recent change in California law implements a program called Cal-Mediconnect, which switches Medicare and Medi-Cal beneficiaries to HMO-managed plans unless the beneficiary objects to the switch.

469.     The HMO-managed plans will approve rehabilitation services only on an as needed basis, not in chunks of time, like Medicare approves.

470.    In many cases, Riverside's patients did not read the packet explaining the law or the change to their plan either because they did not care, did not understand, could not read the packet because of their medical condition, or could not properly verify their identification over the phone to the State.

471.    For many of the same reasons, many patients did not respond to the information at all, thereby causing their insurance to be switched from Medicare or Medi-Cal to an HMO-managed plan.

472.    Tillman instructed the administrative staff at Riverside, including Director of Admissions Rebecca Brizuela, Assistant Business Office Manager Brenda Ponce, Receptionist Erica Hamilton, Pena, a volunteer named Mario Garcia, and Orozco to take turns calling the State and tell the State that they were the patient or the patient's family member and request the patient's insurance remain Medicare manager, and not be switched to an HMO.

473.    Tillman instructed the staff to print out the patient's face sheet and use the information on the face sheet to verify the patient's identity over the phone to the State.

474.    Riversides medical director, Dr. Pengson also instructs the Riverside staff to encourage patients to un-enroll from the HMO-managed health plans.

475.    During a Quality Assurance Meeting in the January 2015, Dr. Pengson attended the meeting and wanted to know what Riverside was doing to address the automatic HMO-managed enrollment for its patients.

476.    When Orozco told Dr. Pengson that the administrative staff was speaking to the families and patients about the change, Dr. Pengson told Orozco that the staff at Riverside needed to un-enroll the patient no matter what, and the staff should go so far as to tell the patients that Dr. Pengson does not accept the HMO provider plan to encourage them to un-enroll.

477.    Orozco knows that Orange engages in this same practice as Ayrapetyan sent an
email to the Riverside and Orange business office managers instructing them to call the State as
if they were the patient and un-enroll from the HMO-managed plan.

478.    When Orozco spoke with Orange's business office manager, Angie Rivera, she
asked Orozco what Riverside was doing about patients who were not alert, or did not want to
transition back to a Medicare managed plan.

479.    When Orozco told Rivera that Tillman was instructing the Riverside staff to call
and pretend to be the patient, Rivera responded that Ayrapetyan had instructed the staff at
Orange to do the same, but that Rivera was not comfortable doing that.

480.    Riverside would withhold medical services from patients who refused to un-enroll
from the HMO-managed plan.

481.    Patient R.B. was happy with his HMO-managed plan and would often complain
that he did not feel well and needed to go to the hospital.

482.    Ayrapetyan told the nurses at Riverside that they were not allowed to send R.B. to
the hospital until he un-enrolled from the HMO-managed plan.

483.    Staring around November 2014, through her termination in February 2015,
Orozco witnessed this happen at least six times a month.

**e.   Riverside falsifies patient conditions to re-certify a patient.**

484.    Once a patient uses their 100 days of service, Medicare will not pay for additional
rehabilitation, and if the patient does not have secondary insurance it means that the facility will
not get paid to keep the patient.

485.    Because the facility does not make money off of a patient after 100 days,
Ayrapetyan would text the nurses responsible for patients who had been at Riverside, and the

other facilities she oversees, for more than 100 days and tell the nurse that "these patients need a change of condition today" and list the patients' names.

486.   After receiving this text, the nurse would call 911, claiming that the patient was having heart or breathing problems.

487.   An ambulance would come and pick up the patient and bring the patient to Parkview.

488.   Once at Parkview, the patient would be assigned to Dr. Ghaly, Dr. Pengsen, or Dr. Tabel, depending on who the patient was assigned to at Riverside.

489.   As previously described, Riverside pays Dr. Ghaly, Dr. Pengsen, and Dr. Tabel and these doctors will purposefully not examine the patient for three days.

490.   After being in the hospital for three days, the patient is deemed to have had a qualifying stay for Medicare's purposes, so the doctor examines the patient, determines that nothing is wrong with the patient, and sends the patient back to Riverside for an additional 100 days of paid service.

### IX.   Corporate Defendants Fail to Remit Overpayments to Medicare.

491.   Every quarter, Riverside is required to fill out a Medicare Overpayment Report stating the amount the facility owes Medicare due to overpayments it received during that quarter.

492.   The first time Orozco saw this form, when she was promoted in the spring of 2014, Orozco asked Riverside's Business Consultant Ann Dixon how to complete the form.

493.   Dixon told Orozco to enter zeros in all of the columns and have the Administrators sign the form.

494.    Dixon instructed Orozco to enter all zeros even though, internally, Riverside's accounting books show that Riverside receives overpayments from Medicare.

495.    The following month Orozco more closely examined the form and asked Dixon why they would enter all zeros if they received overpayments.

496.    Dixon responded that she would explain the process to Orozco at a later time, but she never did.

## X.      Defendants' Intent to Defraud the Government.

### a.   Rechnitz instructs the Corporate Defendants to defraud the government.

497.    Rockport often trains its new employees at its office in Los Angeles.

498.    Brad Gibson, Rockport's Chief Financial Officer, often attends employee training sessions and tells employees to place patients at the most practical RUG level and to make money while doing it.

499.    Gibson repeatedly would say, "Shlomo wants this" and "Shlomo is the boss."

500.    Gibson also said that Rechnitz said that would own all nursing homes in California.

501.    Additionally, as previously discussed, Robin, Ayrapetyan and Smith report directly to Rechnitz.

502.    Robin, Ayrapetyan, Smith, all oversee the daily operations of Rechnitz's facilities and instruct employees to provide kickbacks to patients, doctors and case managers and also instruct employees to place patients on the highest levels of RUG therapy, regardless of medical necessity.

**b. Corporate Defendants hold daily meetings to discuss the number of Medicare patients in the facility and how to discourage patients attempting to leave the facility.**

503.    Every morning the staff checks all patients to verify that the patients are present; these verifications are entered into a spreadsheet.

504.    The spreadsheet includes: the patient name; the patient's current insurance; and if the patient was on Medicare, how many days the patient had left on Medicare.

505.    If Riverside was planning to discharge a Medicare patient, employees were required to email an explanation as to why the patient was leaving to Ayrapetyan and Robin.

506.    All the information would be compiled on a spreadsheet called the "daily morning census," which Orozco would circulate to all department managers every morning.

507.    Occasionally, if the number of Medicare patients was low, Robin would send an email warning, "we're going in the wrong direction."

508.    Also every morning, at around 9:00 a.m. management would meet to discuss the current caseload; these meetings were called "stand up" meetings.

509.    The following people attended these stand up meetings: Orozco; both Administrators (Tillman); the Director of Activities, Jennifer Velasquez; the Director of Nursing Elphelet Zapanta; the Director of Social Services, Vee Broadie; the Dietary Director, Louella Dateuin; the MDS Director, Lindsey Licup; the Central Supply Director, Yocelyn Perez; the Case Management Director, Mayra Gallegos; the Medical Records Director, Carol Manly; the Staffing and Development Director, Hanna Abrillo; and the Maintenance Director, Sergio Becerra.

510.    The first issue addressed in every stand up meeting was the number of new Medicare patients coming into the facility.

511. If someone knew of a Medicare patient trying to leave, that person was to share that information at the meeting.

512. Also, if Riverside recently admitted a new Medicare patient, all the directors were required to go meet with the patient and introduce themselves, to make sure that the Medicare patients felt special.

### c.  Corporate Defendants have Medicare enrollment goals and rewards.

513. Every month, Ayrapetyan sends an email to the facilities she manages indicating the facility's monthly Medicare enrollment target.

From: Admissions - Alta Vista HC & Wellness <Admissions@altavistarehab.com>
Date: December 19, 2014 at 10:28:14 AM PST
To: "dehamilton010@gmail.com" <dehamilton010@gmail.com>
Subject: FW: Dec Census Challenge !!!

From: Aneta Ayrapetyan
Sent: Thursday, December 11, 2014 12:17 PM
To: Administrator - Fresno; Sales and Marketing - Fresno; Admissions - Fresno; Administrator - Mesa Verde Healthcare; DON - Mesa Verde Healthcare; Sales and Marketing - Mesa Verde Healthcare; Admissions - Mesa Verde Healthcare; Administrator - Oakhurst; DON - Oakhurst; Admissions - Oakhurst; Administrator - Montecito; DON - Montecito; Sales and Marketing - Montecito; Admissions - Montecito; Administrator - Orange HC & Wellness Ctr; DON - Orange HC & Wellness Ctr; Admissions - Orange HC & Wellness Ctr; Sales and Marketing - Orange HC & Wellness Ctr; Administrator - North Point Healthcare & Wellness Centre; DON - North Point Healthcare & Wellness Centre; Admissions - North Point Healthcare & Wellness Centre; Administrator - Alta Vista HC & Wellness; Sales and Marketing - Alta Vista HC & Wellness; Admissions - Alta Vista HC & Wellness; DON - Alta Vista HC & Wellness
Cc: Aaron Robin; Joy Dioquino-Smith; Lynn Navison
Subject: RE: Dec Census Challenge !!!

*Congratulations* to Alta Vista Healthcare Center for hitting their goal of 31 Medicare!!!
Do I hear another challenge? Your second challenge for the month of Dec is 36!  Good Luck!

514. If the doctors refer the target number of Medicare patients, Robin will approve a cash bonus for the doctors between $1,000 and $2,000.

515. Riverside's Director of Case Management is allowed to give cash bonuses to social service managers and facility case managers for discharging Medi-Cal patients to make room for Medicare patients.

516. In or around March 2012, Robin approached Riverside's then Director of Social Services, Ted Johnson, and told him that Riverside needed to start making room for Medicare patients.

517. To achieve this, Robin told Johnson that for every Medi-Cal patient Johnson was able to discharge from Riverside, Robin would pay Johnson $100.

518. In or around February 2012, when Orozco started working payroll, Johnson came to Orozco and asked for his bonus.

519. Since Orozco did not know what Johnson was talking about, Orozco asked Riverside's Administrator at the time, Chris Romney, about Johnson's bonus.

520. Romney told Orozco about Robin's deal with Johnson, and instructed her to process the bonus in Johnson's paycheck.

521. The bonus is processed through payroll and the approval comes directly from Robin.

### d. Defendants direct their employees to treat Medicare patients like VIPs to the exclusion of everyone else.

522. Riverside Administrators, Ayrapetyan, and Robin, instruct their staff to treat Medicare patients as VIPs and to encourage everyone else to leave.

523. Every time Ayrapetyan speaks with Orozco, she emphasizes that Orozco should treat Medicare patients as VIPs.

524.    For example, during Orozco's first meeting with Ayrapetyan when Orozco was promoted to housekeeping supervisor, Ayrapetyan congratulated Orozco and took Orozco around the facility to discuss Orozco's new duties.

525.    When Ayrapetyan and Orozco stopped at G.N.'s room, Ayrapetyan asked Orozco if G.N. was a Medicare patient.

526.    When Orozco responded that he was, Ayrapetyan responded "we need to treat him as a VIP and make sure everything is clean and brand new."

527.    Ayrapetyan also instructed Orozco to order a new toilet seat for G.N. as he requested one due to his height.

528.    When Orozco was promoted again in June 2014, Ayrapetyan told Orozco that "[Riverside] treats Medicare as VIPS and [Riverside] doesn't collect money from them."

529.    Patient E.S. came in with Medicare and no secondary insurance.

530.    As is Riverside's custom, Desai and Pennachio told E.S.'s son, N.P. that they would not collect the shared cost from E.S. after a twenty day stay as they were required to do by Medicare.

531.    During E.S.'s stay Riverside's Business Office Manager at the time tried to help E.S. apply for secondary insurance so Riverside would not attempt to kick E.S. out when her 100 Medicare days ran out. E.S.'s Medi-Cal application was denied.

532.    When E.S.'s 100 Medicare days were up, Riverside attempted to kick E.S. out over the son's protest.

533.    When N.P. protested, Ayrapetyan threatened to take E.S. and N.P. to collections for the close to $40,000 Ayrapetyan claimed E.S. owed the facility for her stay.

534.   N.P. offered to give Ayrapetyan a piece of property to pay the balance, but in the meantime, Orozco was able to reapply for Medi-Cal for E.S., and the second application was approved.

535.   ES then obtained a "wellness period" and at the end of the thirty days, Ayrapetyan told the nurse that E.S. needed a "change of condition."

536.   After E.S.'s "change of condition" E.S. was approved for another 100 Medicare days.

537.   N.P. reported to Orozco that he was pleased when his mother got a "change of condition" because he knew when Medicare was paying the bills his mother would be well cared for as opposed to when Medi-Cal was paying the bills and Riverside would not turn his mother, resulting in bed sores, and would not change his mother's diaper.

538.   E.T. was another patient who had Medicare primary and no secondary insurance.

539.   At the end of E.T.'s 100 Medicare days, with no secondary insurance, E.T. would have to pay to stay at Riverside out of pocket, which she could not afford to do, in large part because her son was stealing her social security money.

540.   Ayrapetyan made a deal with another facility to admit E.T. for thirty days, which Riverside would pay for, just to get E.T. off of Riverside's service after Medicare stopped paying.

541.   Similar to E.S., patient L.L. came to Riverside with an HMO-managed plan.

542.   Ayrapetyan told Orozco that she had to un-enroll L.L. from the HMO-managed plan and then have the nurse give L.L. a "change of condition" to requalify L.L. for skilled nursing services under Medicare.

543.    In the intervening thirty day "wellness stay" L.L. had to have before she could requalify for Medicare's 100 days of skilled nursing care, L.L. received no services at all from Riverside, including medical services, therapy, or nursing attention.

544.    Mr. C was another patient whose family would get very upset with Riverside because Riverside would immediately try to discharge Mr. C the day that Mr. C's 100 Medicare days ran out.

545.    Patient N.G. was a private pay patient and Ayrapetyan would try to get a "change of condition" for N.G. to get N.G. in the hospital and off of Riverside's service.

### e.  Riverside's employees requested that the State investigate the ongoing fraud.

546.    In or about March of 2014 and again in November of 2014, Orozco contacted the State through an online form about many of the problems occurring at Riverside.

547.    Orozco asked the State to come investigate Riverside, but specifically requested one investigator, Chad Nakata from the Board of Health not be sent to investigate as the staff believes Nakata has a relationship, either personally or financially with Riverside.

548.    Nakata sends text messages to Zapanta, Manly, and Nurse Consultant Carol Ditulio, quite often.

549.    Additionally, Zapanta always knows when the state is coming to investigate Riverside because Nakata gives her a heads up.

550.    Despite the staff's request, Nakata was sent by the State to investigate the staff's complaint.

551.    Nakata interviewed everyone at Riverside and asked about the allegations that Medicare patients were treated better and the staff was given incentives to retain Medicare

patients and discharge Medi-Cal patients, but no staff member felt comfortable discussing the issues with Nakata because the manager was always in the room with Nakata.

552.    Nakata emailed Riverside's Administrators directly to ask questions about whether patients are required to pay their half of the shared cost, as opposed to asking billing, or investigating independently.

553.    As expected, Nakata found no violations occurring at Riverside.

## XI.    The Corporate Defendants Retaliated Against Orozco for Contacting the State.

554.    Riverside refuses to pay overtime to any staff member other than nurses, and has a strict policy not to work overtime.

555.    Robin and Ayrapetyan make it clear to the administrators, who tell the Department Managers and Supervisors that no staff member is allowed to bill for overtime hours worked.

556.    Despite this policy, many administrative staff members need to work overtime to complete all of their work.

557.    Staff enters their time via a "correction form" even though the facility has a punch clock.

558.    If any staff member enters overtime on their correction form, the administrators, supervisors, and Ayrapetyan order Orozco to change their hours.

559.    Romney originally told Orozco that he discussed this hour change with the effected staff member, but Orozco later found out that Romney never did speak to the employee whose hours were changed.

560.    Desai and Rhead would speak to the supervisor of whoever hours were changed and the supervisor would let the employee know that their hours had been changed.

561.    If staff members persisted in entering overtime hours, they were fired.

562.    The other facilities Ayrapetyan oversees had the same overtime policy.

563.    In lieu of overtime compensation, Rhead told employees to use the company Sam's Club Card to purchase gas or groceries.

564.    When Tillman first started at Riverside in or around November 2014, Tillman approached Orozco and told Orozco that Tillman knew Orozco contacted the state and not to worry, but to never let Ayrapetyan know.

565.    When Orozco asked why Tillman thought Orozco was the one who contacted the state, Tillman smiled and said "I know everything."

566.    A few months later, Tillman told Orozco that Ayrapetyan knew Orozco contacted the State and Ayrapetyan wanted Orozco out, but Tillman would fight for Orozco.

567.    In or about February 2015, Tillman suspended Orozco for allegedly abusing the company's Sam's Club Card.

568.    Tillman was well aware of the company's use of the Sam's Club Card to provide reimbursement to staff who cannot claim overtime hours.

569.    Tillman question approximately $321 worth of charges on the Sam's Club Card allegedly made by Orozco, and suspended Orozco for two weeks pending an investigation.

570.    During Orozco's two-week suspension, Tillman told the staff at Riverside, that Orozco was embezzling money from the company.

571.    Orozco was at no time embezzling money from the company.

572.    At the end of the two-week suspension, Orozco emailed Tillman to ask about the investigation into the Sam's Club Card charges.

573.    Tillman forwarded Orozco's email to Ayrapetyan.

574.   In response to Orozco's email, Ayrapetyan called Orozco but would not tell Orozco if she was being fired.

575.   Assuming she was being fired, Orozco asked for her final check.

576.   Ayrapetyan told Orozco that the $321 Riverside questioned Orozco about would be deducted from Orozco's check.

577.   Ayrapetyan told Orozco that if Orozco paid the money back, "the charges would be dropped."

578.   Orozco said to Ayrapetyan, "you know that the gift cards we bought were used to pay case managers and doctors" and that Tillman and Tillman's predecessor allowed employees to use the Sam's Club Card for gas and groceries.

579.   Ayrapetyan denied both of these statements.

580.   Ayrapetyan then demanded Orozco sign a confidentiality agreement, which Orozco refused to do.

581.   Orozco ultimately received her final check without any deductions.

582.   While Orozco has not spoken to Ayrapetyan or Tillman since her termination, Tillman has continued to tell staff members at Riverside that Orozco was stealing money from the company.

## Count I
### Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(A)
### (As to All Defendants)

583.   Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

584.   Defendants, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the government and its officials, false or

fraudulent claims in order to obtain payment or approval from the government, in violation of 31 U.S.C. § 3729(a)(1)(A)

585.    Defendants knowingly presented or caused to present to the government false claims by: (1) assigning nearly all of its Medicare patients to rehab therapy (unnecessary services); (2) placing almost all of its Medicare patients on the highest and costliest forms of rehab therapy (upcoding); (3) failing to provide services for which they billed; (4) extending nursing stays (unnecessary services).

586.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

### Count II
### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### (As to All Defendants)

587.    Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

588.    Defendants, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the government and its officials, false records or statements material to false or fraudulent claims and knowingly failed to disclose material facts, in order to obtain payment or approval from the government, in violation of 31 U.S.C. § 3729(a)(1)(B).

589.    Defendants submit false records or statements material to false claims by falsifying patients' conditions, instructing employees to pretend to be Medicare patients to continue Medicare coverage, and falsifying staffing levels.

590.    Defendants also certified compliance with applicable Medicare regulations but violated these regulations.

591.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

### Count III
### Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(C) (Conspiracy)
### (As to All Defendants)

592.    Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

593.    Defendants violate the False Claims Act, 31 U.S.C. § 3729(a)(1)(C), when they conspire to knowingly presents or caused to be presented, false claims to the government through Medicare.

594.    Defendants, through their complex corporate relationships, conspired to submit false claims to the government.

595.    Defendants, primarily through the direction of Rechnitz, implemented an extensive, corporate kickback scheme to entice doctors and hospital case managers to refer patients to their facilities.

596.    Once Defendants were able to secure patients at their facilities they continued to engage in a variety of fraudulent activity, all with the purpose of maximizing Medicare payments.

597.    As discussed in more detail above, Rechnitz, and other top-level management, directed these fraudulent activities at Riverside and various other facilities within Rechnitz's corporate network.

598. The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## Count IV
### Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(G) (Reverse False Claim)
### (As to the Corporate Defendants)

599. Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

600. The Corporate Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), when they knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

601. The Corporate Defendants failed to remit overpayments to Medicare.

602. Specifically, Riverside's accounting books show that Riverside receives overpayments for Medicare but Riverside management instructed Orozco to report to Medicare that the facility did not owe Medicare any money for overpayments.

603. The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## Count V
### Violation of The Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b)
### (As to the Corporate Defendants)

604. Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

66

605.    The Anti-Kickback Statute, in part, prohibits anyone from knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.  42 U.S.C. § 1320a-7b(b).

606.    The Corporate Defendants maintain an illegal financial relationship with Dr. Gamal Ghaly, Dr. Joel Pengson, and Dr. Ghasan Tavel.

607.    The Corporate Defendants pay Drs. Ghaly, Pengson, and Tabel monthly consulting fees in exchange for referrals from these three doctors however these doctors perform little to no services at Riverside.

608.    The Corporate Defendants' actions have led to the federal government for paying for unnecessary services that were falsely referred by these doctors.

609.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## Count VI
### Violation of The Stark Act, 42 U.S.C. §1395nn
### (As to Dr. Gamal Ghaly, Dr. Joel Pengson, and Dr. Ghasan Tabel)

610.    Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

611.    The Stark Act prohibits a physician from referring Medicare patients from designated health services to an entity with which the physician (or immediate family member) has a financial relationship, unless an exception applies.  42 U.S.C. § 1395nn(a)(l).

612.    The designated health services entity is prohibited from submitting claims to Medicare for those services resulting from a prohibited referral. *Id.*

613.    Drs. Ghaly, Pengson, and Trabel maintain illegal financial relationships with the Corporate Defendants who pay these doctors monthly consulting fees and bonuses in exchange for patient referrals.

614.    Drs. Ghaly, Pengson, and Trabel's actions have led the federal government to paying for unnecessary services that were falsely referred by these doctors.

615.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

### Count VII
### Violation of The False Claims Act, 31 U.S.C. §3730(h)
### (As to the Corporate Defendants)

616.    Relator re-alleges and incorporates the allegations set forth above as though fully alleged herein.

617.    The Corporate Defendants terminated Orozco because she voluntarily performed lawful acts to investigate one or more violations of the False Claims Act, including raising concerns about Defendant's fraudulent billing to Medicare and reporting Defendants to state authorities.

618.    At all relevant times, Orozco was engaging in activity protected by the False Claims Act.

619.    The Corporate Defendants, knowing that Orozco was engaging in such activity, terminated her because of her protected conduct.

620.   To redress harms she suffered as a result of the acts and conduct of Defendants in violation of 31 U.S.C. § 3730(h), Orozco is entitled to damages including two times the amount of back, interest on back pay, and compensation for any special damages, including emotional distress and any other damages available by law including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, the Relator Neyirys Orozco, acting on behalf of, and in the name of, the United States of America and on her own behalf, prays that judgment be entered against Defendants for violations of The False Claims Act as follows:

(a)   In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney's fees, and costs incurred by the Relator;

(b)   In favor of the United States against Defendants for treble damages to the federal government from the submission of false claims, and the maximum civil penalties for each violation of The False Claims Act;

(c)   In favor of the United States against the Defendants for treble damages to the federal government from the submission of false claims, and the maximum civil penalties for each violation of The Anti-Kickback Statute;

(d)   In favor of the United States against the Dr. Gamal Ghaly, Dr. Joel Pengson, and Dr. Ghasan Tabel for treble damages to the federal government from the submission of false claims, and the maximum civil penalties for each violation of The Stark Act;

(e)   In favor of Relator for all compensatory and punitive damages, including personal injury damages for pain and suffering, emotional distress, and loss of reputation, back

pay, and interest, and attorney's fees and costs to which she is entitled under 31 U.S.C. § 3730(h); and

(f)     Any other such relief that the Court may deem just and equitable.

Dated: April 7, 2015                    Respectfully Submitted,

                                        R. Scott Oswald
                                        Florida State Bar No.: 158437
                                        David Scher (to be admitted *pro hac vice*)
                                        The Employment Law Group, P.C.
                                        888 17th Street, NW, Suite 900
                                        Washington, D.C. 20006
                                        (202) 261-2803
                                        (202) 261-2835 (facsimile)
                                        soswald@employmentlawgroup.com
                                        dscher@employmentlawgroup.com

                                        Attorneys for *Qui Tam* Plaintiff



Express







JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Neyirys Orozco

**DEFENDANTS**

TWIN MED, LLC, DR. OMO RECHTZ, JONATHAN WEISS, RIVERSIDE HEALTHCARE, WELLNESS CENTRE, LLC, ALTA VISTA HEALTHCARE & WELLNESS CENTRE, CITRUS WELLNESS CENTRE, LLC, RECHNITZ CITRUS, GP, BRIUS MANAGEMENT CO. INC., BRUIS LLC, SOL MANAGEMENT, LLC, DOES I-100, ROCKPORT HEALTHCARE SERVICES, ROCKPORT, GAMAL GHALY, JOEL PENISON, AND GHASAN TABEL.

**(b)** County of Residence of First Listed Plaintiff   Riverside County, Califor
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Orange County, Florida
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
R. Scott Oswald, David L. Scher, The Employment Law Group, P.C.
888 17th St. NW, 9th Floor, Washington, D.C. 20006

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Federal False Claims Act, 31 U.S.C. §§ 3729 et seq., The Stark Act, 42 U.S.C. § 1395nn(a)(l), and The

Brief description of cause:
qui tam action

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #   15888   AMOUNT   400.00   APPLYING IFP   JUDGE   32   MAG. JUDGE   PDB

CV15-06177