1  David L. Scher, Esq.
2  dscher@employmentlawgroup.com
3  California Bar No. 184562
   Adam Augustine Carter, Esq. (to be
4  admitted *pro hac vice*)
5  acarter@employmentlawgroup.com
6  R. Scott Oswald (to be admitted *pro hac vice*)
7  soswald@employmentlawgroup.com
8  The Employment Law Group, P.C.
   888 17th Street, NW, Suite 900
9  Washington, D.C. 20006
10 (202) 261-2806
11 (202) 261-2835 (facsimile)

FILED
CLERK, U.S. DISTRICT COURT

SEP - 8 2015

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
*Western Division (Los Angeles)*

|  |  |
|---|---|
| UNITED STATES OF AMERICA AND THE STATE OF CALIFORNIA EX REL. NEYIRYS OROZCO<br><br>Plaintiffs,<br><br>v.<br><br>SHLOMO RECHNITZ, JONATHAN WEISS, RIVERSIDE HEALTHCARE WELLNESS CENTRE, LLC, ALTA VISTA HEALTHCARE & WELLNESS CENTRE, CITRUS WELLNESS CENTRE, LLC, RECHNITZ CITRUS, GP BRIUS MANAGEMENT CO. INC., | Case No.  CV 15-6177 AB (JEMx)<br>**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729** *et seq.***, The Stark Act, 42 U.S.C. § 1395nn(a)(l), and The Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), and The California False Claims Act, Cal. Gov't code § 12650** *et seq.*<br><br>**FILED UNDER SEAL**<br>**Jury Trial Demanded** |

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

BRIUS LLC, SOL
MANAGEMENT, LLC, DOES
1-100, ROCKPORT
HEALTHCARE SERVICES,
ROCKPORT, GAMAL GHALY,
JOEL PENGSON, GHASAN
TABEL, TWIN MED LLC.

Defendants.

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

3

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**Table of contents**

Introduction.................................................................................................7

Jurisdiction and Venue...............................................................................10

Parties........................................................................................................10

Applicable Legal Background ....................................................................19

      a.      Medicare Regulations .............................................................19

      i.      Requirements to trigger the use of Medicare
            Part A coverage .....................................................................19

      ii.      Duration of coverage..............................................................20

      iii.     Exhaustion of Medicare benefits ...........................................20

      b.      RUG levels ............................................................................21

      i.      Process for assigning RUG levels............................................23

      c.      Medi-Cal Regulations ............................................................25

      d.      Kickbacks and Self-Referrals.................................................25

Factual Allegations ....................................................................................26

    I.      Corporate Defendants' Management Structure...............................26

      a.      Each Rockport facility has at least one
            administrator and one marketer. ...........................................26

      b.      Each administrator reports to Rockport's
            Vice President of Operations. .................................................29

      c.      Rockport's Vice President of Operations
            reports to Rockport's Chief Operating
            Officer. .................................................................................29

      d.      Rechnitz hires certain managers at
            Riverside; Rockport's Vice President of
            Operations, Rockport's Chief Operating
            Officer, and Rockport's Regional Business
            Director all report to Rechnitz. ..............................................30

      e.      Each Rockport facility pays certain doctors
            to serve as "Medical Directors" and "Quality
            Assurance Directors." ............................................................30

      f.      Rockport employees have control over
            Riverside's primary bank account. ........................................32

4

g.   Rockport trains the employees of Riverside and other facilities on accounting practices and also approves any major purchases....................................33

II.   Defendants Engage in a Wide-Spread, Systematic, Corporate Kickback Scheme to Defraud Medicare. .........................37

a.   Corporate Defendants hire marketers to entice doctors and hospital case managers to refer Medicare patients to their facilities. ...............................37

b.   Marketers spend significant amounts of money to entice doctors to refer Medicare patients; Riverside creates fake receipts for marketing expenditures...........................................40

Corporate Defendants provide doctors with cash, a salary, bonuses, hotels, gifts, and attractive women in exchange for Medicare patient referrals. ...................................................43

c.   43

Corporate Defendants provide hospital case managers with gifts and cash in exchange for Medicare patient referrals. ...........................50

d.   50

e.   Defendants provide Medicare patients with gifts, food, and waive certain costs to persuade them to stay at the facility as long as possible. ........................................................60

III.   Defendants Knowingly Present False Claims for Payment or Approval to Medicare. ...............................76

Riverside nurses do not adequately assess patients. ........................................................77

a.   77

f.   Riverside falsely inflates patients' diagnoses............................................................79

Riverside assigns nearly all of its Medicare patients to rehabilitation therapy and places them on the highest level of therapy possible.....................................................80

g.   80

h.   Riverside fails to provide the services for which it billed. ...................................82

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

      i.    Riverside unnecessarily drugs certain patients to quell their screams.................................84

IV.    Defendants Submit False Records or Statements Material to False Claims to Medicare. ..........................84

V.    Corporate Defendants Fail to Remit Overpayments to Medicare.................................................................95

VI.    Defendants Violate the California False Claims Act ...............................................................................96

      a.    Corporate Defendants discriminate against Medi-Cal patients.......................................96

      b.    Corporate Defendants provide kickbacks to employees to discharge Medi-Cal patients. ..............99

      c.    Corporate Defendants fail to provide for services to Medi-Cal patients for which they had billed.....................................................102

      d.    Corporate Defendants submitted materially false information to Medi-Cal..........................102

VII.    Defendants' Intent to Defraud the Government...........................104

VIII.    The Corporate Defendants Retaliated Against Orozco for Contacting the State. ............................114

Count I.................................................................................117

Count II................................................................................118

Count III...............................................................................119

Count IV...............................................................................120

Count V................................................................................121

Count VI...............................................................................122

Count VII..............................................................................123

Count VIII.............................................................................124

PRAYER FOR RELIEF .........................................................125

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## Introduction

1.     Qui tam relator Neyirys Orozco ("Relator" or "Orozco"), by and through her attorneys, individually and on behalf of the United States of America and the State of California, files this Complaint against Shlomo Rechnitz ("Rechnitz"); Jonathan Weiss ("Weiss"); Rechnitz Citrus GP ("Rechnitz Citrus"); Citrus Wellness Center, LLC ("Citrus Wellness"); Riverside Healthcare & Wellness Centre, LLC, ("Riverside"); Alta Vista Healthcare and Wellness Centre ("Alta Vista"); Brius Management Co. Inc. ("Brius Management"); Brius LLC ("Brius"); Sol Management, LLC ("Sol"); Does 1-100; Rockport Healthcare Services ("Rockport"); Dr. Gamal Ghaly ("Dr. Ghaly"), Dr. Joel Pengson ("Dr. Pengson"), Dr. Ghasan Tabel ("Dr. Tabel"), and Twin Med, LLC ("Twin Med") (hereinafter collectively referred to as "Defendants")[1] to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*; The Stark Act, 42 U.S.C. § 1395nn(a)(l); The Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b); and The California False Claims Act, Cal. Gov't Code § 12650 *et seq.*

---

[1] Shlomo Rechnitz; Jonathan Weiss; Rechnitz Citrus GP; Citrus Wellness Center, LLC; Riverside Healthcare & Wellness Centre, LLC; Alta Vista Healthcare and Wellness Centre; Brius Management Co. Inc.; Bruis LLC; Sol Management, LLC; Does 1-100; Rockport Healthcare Services; Twin Med, LLC are hereinafter referred to as "Corporate Defendants." Thus, "Corporate Defendants" refers to all entities and people linked to Shlomo Rechnitz but do not include Drs. Gamal Ghaly, Joel Pengson, and Ghasan Tabel.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

2.      Beginning in February 2012, Orozco worked at Riverside (because Riverside is partially owned by Alta Vista, it is often also referred to as Alta Vista), a skilled nursing facility located in Southern California.

3.      Riverside is one facility within an extremely complex maze of corporations–all of which lead back to its owner, Shlomo Rechnitz.

4.      During Orozco's time at Riverside, she witnessed a whole host of fraudulent activities, all of which are a part of Defendants' efforts to collect as much Medicare reimbursement funds as possible.

5.      Rechnitz directs the Corporate Defendants to engage in many, if not all, of these fraudulent activities.

6.      Corporate Defendants give doctors and hospital case managers almost any type of incentive – including cash, gifts, attractive women, and dinners – in exchange for Medicare patient referrals.

7.      Additionally, several doctors have illegal financial relationships with the Corporate Defendants, in the form of a salaries and bonuses, in exchange for Medicare patient referrals.

8.      Once Defendants are able to secure patients at their facilities, they consistently place patients on the highest levels of therapy possible, when, in almost all instances, the patients require little to no therapy.

9.     Defendants direct staff to treat Medicare patients as VIPs to the exclusion of all other patients.

10.    Accordingly, Defendants give Medicare patients whatever they want – food, money, payment for rent, waiver of required medical costs, and other incentives – to persuade them to stay at the facility as long as possible.

11.    Defendants also submit materially false statements and information to Medicare.

12.    Defendants alter paperwork, direct their staff to pretend to be patients to ensure that benefits continue, and falsify patients' conditions to recertify patients for continued care.

13.    Defendants demonstrate their intent to engage in such rampant fraudulent behavior in several ways.

14.    Defendants hold daily meetings in which management discusses the current status of all Medicare patients and how to discourage Medicare patients from leaving the facility.

15.    Defendants also offer Medicare enrollment goals and rewards to their managers and staff.

16.    When Orozco requested that the State of California investigate matters at Riverside, the State and Riverside did nothing to change Riverside's practices.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

17.   Finally, the Corporate Defendants unlawfully retaliated against Orozco after learning that Orozco filed complaints with federal and state authorities regarding Riverside's unlawful practices.

### Jurisdiction and Venue

18.   This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730 and 3732.

19.   This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732 (a) because Defendants transacts business in this judicial district.

20.   This Court has supplemental jurisdiction over Orozco's State law claim pursuant to 28 U.S.C. § 1367, because it is so related to her claims arising under federal law that they form part of the same case or controversy.

21.   Venue is proper in this District pursuant to 31 U.S.C. § 3732 (a) and under 28 U.S.C. § 1391(c) because Defendants transacts business in the Los Angeles Division of this judicial district and because several of the acts alleged herein occurred in the Central District of California.

### Parties

*Relator Neyirys Orozco*

22.   Relator Neyirys Orozco is currently a resident of Perris, California.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

23.   Orozco represents an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and states that to her knowledge, the information contained herein has not been publicly disclosed.

24.   On or around February 14, 2012, Riverside hired Orozco as its Accounts Payable Representative and Payroll Coordinator. In June 2013, Riverside's administrator at the time, Micah Rhead, promoted Orozco from the position of Accounts Payable Representative to the position of  Director of Environmental Services.

25.   In this role, Orozco was in charge of housekeeping and laundry employees.

26.   In or about June 2014, Riverside again promoted Orozco to the position of Business Office Manager.

27.   In June 2014, David Rodriguez ("Rodriquez") replaced Orozco's position as Riverside's Accounts Payable Representative.

28.   In the role of Business Office Manager, Orozco was responsible for a wide variety of tasks including: billing to insurance companies, payroll, supervising certain accounting duties, preparing reports on current patients, managing the trust accounts of the patients, managing Riverside's bank accounts, and reviewing the admission of new patients.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

29.  Orozco also worked at other facilities, attended daily meetings, and occasionally purchased marketing supplies from Sam's Club.

***Defendants Shlomo Rechnitz; Rechnitz Citrus GP; Brius Management Co, Inc.; Brius, LLC, Sol Management, LLC; and Does 1-100***

30.  The Corporate Defendants' complex corporate structure traces back to one person: Shlomo Rechnitz.

31.  Rechnitz, California's biggest nursing homeowner, has a maze of more than eighty limited liability corporations tied to him and more than fifty nursing homes under his ownership and control.

32.  The Sacramento Bee newspaper conducted an investigation in Rechnitz's ownership of nursing homes  and created the following diagram:[2]

---

[2] This diagram is available at: http://www.sacbee.com/news/investigations/nursing-homes/article3586406.htm.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835



33.  Rechnitz owns Defendant Rechnitz Citrus GP.

34.  Upon information and belief, Rechnitz, Brius Management Co, Inc., Brius, LLC, Sol Management, LLC, and Does 1-100, own more than fifty facilities which are uniformly owned, operated, managed or controlled by Rechnitz.

35.  Riverside Healthcare & Wellness Centre, LLC, the facility where Orozco worked, is among these facilities and will be further discussed below.

36.  In 2014, when Rechnitz sought to buy several distressed nursing homes out of bankruptcy, he filed internally prepared 2013 combined financials for limited liability companies of which Brius Management is the managing member.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

37.   In these filings, Rechnitz reported Brius Management's operating revenue of $178.9 million and net income of $27.4 million.

38.   In a separate filing, under the title of "Brius Healthcare/Shlomo Rechnitz" the company reported overall revenue of $611 million and net income of $77 million.

39.   However, in 2014, Brius LLC told California auditors that it had no assets or income.

**Defendant Twin Med LLC**

40.   Twin Med is a medical device supply company based in California but with warehouses in Florida and other states.

41.   Twin Med was co-founded by Rechnitz and his brother, Steve Rechnitz.

42.   Twin Med parent company is based in California.

43.   Twin Med has a Florida subsidiary that leases more than 50,000 square feet of warehouse space located at 2126 West Landstreet Road in Orlando, Florida.

44.   Additionally, six trucks are titled and registered to Twin Med LLC at the same Orlando, Florida location.

45.   In more than a dozen federal campaign finance reports, Rechnitz disclosed "TwinMed LCC" or "Twin Med LLC" as an employer.

46.   Rechnitz instructs the Corporate Defendants to order almost all of their medical supplies from Twin Med's warehouse located in Orlando, Florida.

47.   Riverside provides each patient with a daily allowance, approximately two dollars per patient, for various nursing supplies such as toothbrushes, combs, urinals, oxygen tanks, and bed mats.

48.   Rechnitz, through Twin Med, also sells wheelchairs, beds and other medical equipment to Riverside but these supplies are not included in the patients' daily allowance.

49.   Riverside management sets the amount of the daily allowance and this amount changes monthly depending on how well Riverside did financially the previous month.

50.   At Riverside alone, the patients' daily allowance amounts to approximately $8,000 to $9,000 worth of supplies per month purchased from Twin Med.

51.   Orozco believes that Rechnitz requires his other facilities also purchase their medical supplies from Twin Med.

52.   Riverside's Central Supply Director, Yocelin Perez ("Perez"), is responsible for keeping an inventory of these supplies, and tracking how many supplies each patient uses.

53.   Instead, Rockport's Vice President of Operations Aneta Ayrapetyan ("Ayrapetyan") instructs Perez to make up the number of supplies each patient used and order additional supplies from Twin Med.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

54.   Perez often complains that she needed a legitimate inventory system but Ayrapetyan told her to make the charges seem realistic.

**Defendant Rockport**

55.   Defendant Rockport Healthcare Services, a California-based management group, is located in Los Angeles, California and also has corporate offices in the San Francisco area.

56.   Rockport was located at 110 South Fairfax Avenue in Los Angeles but later moved to 5900 Wilshire Boulevard.

57.   Rockport is an administrative services company owned by Rechnitz's accountant, Steve Stroll and his wife, Marsha Stroll.

**Defendants Riverside, Alta Vista, Jonathan Weiss, and Citrus Wellness**

58.   Rockport owns Riverside Healthcare & Wellness Centre, LLC, along with several other skilled nursing home facilities in Southern California, amounting to approximately 1,000 beds.

59.   In or about February 2012, Riverside Administrator Chris Romney told Orozco that Rockport was the parent company of Riverside.

60.   However, in or around November 2014 Rockport Vice President of Operations Aneta Ayrapetyan told Orozco that if the State of California asked, Rockport was only providing administrative services to Riverside.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

61.  Riverside is a ninety-nine bed skilled nursing facility that was converted to a short-term rehabilitation facility about three years ago.

62.  Riverside provides rehabilitation therapy as well as nursing services to patients.

63.  Riverside employees often travel to Rockport for training.

64.  From June 1, 2013 to May 31, 2013, Riverside posted a $1.4 million profit on $12 million in net patient revenue.

65.  During this time, Riverside spent more than $1 million on transactions with related parties, several of which are believed to be connected to Rechnitz.

66.  Since about February 2012, Riverside had approximately twenty-five to forty Medicare patients each month.

67.  In or about March 2015, Riverside had approximately: forty to forty-five Medicare patients; fifty Medi-Cal patients; one private pay patient; and about three to four HMO patients.

68.  The Rockport Vice President of Operations, Aneta Ayrapetyan, manages several Rockport-owned facilities, including Riverside, Skyline, Fresno, Orange, Montecito, North Point Healthcare, Mesa Verde, and Oakhurst.

69.  In addition to Rockport's ownership of Riverside, Riverside is owned by several other parties.

70.   Rechnitz, Rechnitz Citrus GP, and Johnathan Weiss have a five percent or more ownership in Riverside.

71.   According to the California Department of Health, Eretz Alta Vista Properties, LLC, is listed as the property owner of Riverside (and thus it appears that Alta Vista owns Riverside).

72.   Alta Vista, another skilled nursing home facility owned by Rechnitz, is located at 9020 Garfield Street, Riverside, California.

73.   California state records list Citrus Wellness Centre, LLC as Riverside's parent company.

74.   California state records also list two indirect owners of Riverside: Tamar Rechnitz (Shlomo Rechnitz's wife) who holds a one percent stake, and Rechnitz Citrus, GP, which holds a ninety-nine percent interest stake.

75.   Johnathan Weiss, in addition to partially owning Riverside, has interests in the following corporate entities: Orange Healthcare & Wellness Centre, LLC ("Orange Healthcare"); Imperial Heights Healthcare & Wellness Centre, LLC; Bakersfield Healthcare & Wellness Centre, LLC; and Royal Convalescent Hospital, Inc.

*Defendants Dr. Ghaly, Dr. Pengson, and Dr. Tabel*

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

76.  Drs. Ghaly, Pengson and Tabel have served as physicians at the following hospitals close to Riverside: Parkview Community Hospital, Riverside Regional Medical Center and Riverside Community Hospital.

77.  Drs. Ghaly, Pengson and Tabel are also medical directors – but not employees – at Riverside.

### Applicable Legal Background

**a.  Medicare Regulations**

78.  Medicare Part A covers inpatient services, while Medicare Part B covers outpatient services for Medicare beneficiaries.

**i.  Medicare Part A covers rehabilitation or nursing care provided at skilled nursing home facilities, at a predetermined daily rate for each day of care up to 100 days of care.  Requirements to trigger the use of Medicare Part A coverage**

79.  A patient's stay in a skilled nursing home facility or home health care is covered by Medicare Part A only if the patient has spent three consecutive nights in the hospital.

80.  At the end of the patient's three-day qualifying stay at the hospital, the patient's 100 days of Medicare benefits starts the day the patient arrives at the skilled nursing home facility.

81.  The patient's stay at the skilled nursing home facility must begin within thirty days of being discharged by the hospital.

82.   If the patient is in-and-out of the hospital or nursing facility several times but has not stayed out of the hospital for sixty consecutive days, all inpatient bills for that time will be included as part of the same benefit period.

### ii.   Duration of coverage

83.   For the first twenty of 100 days, Medicare will pay for all covered costs, which include all room and board expenses, ancillaries, skilled services, and other all basic services but not television, telephone, or private room charges.

84.   For days twenty-one through 100, Medicare pays eighty percent of the patient's room and board expenses, ancillaries and skilled services; the patient is responsible for paying a co-payment of $157.50 per day.

85.   In 2014, the copayment amount was $152 per day; in 2015 the copayment increased to $157.50 per day.

### iii.   Exhaustion of Medicare benefits

86.   Medicare uses a period of time called a benefit period to keep track of how many days of skilled nursing facility benefits a patient uses and how many are still available.

87.   A benefit period begins on the day a patient starts getting inpatient hospital or skilled nursing facility care.

88.   A patient can receive up to 100 days of skilled nursing facility coverage in a benefit period.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

89.   Once the patient uses those 100 days, the patient's benefit period must end before the patient can renew his or her skilled nursing facility care benefits.

90.   A patients benefit period ends when either: 1) the patient has not been in a skilled nursing facility or a hospital for at least sixty days in a row; or 2) the patient remains in a skilled nursing home facility but has not received skilled care there for at least sixty days in a row (Defendants often call this sixty day time period the "sixty day wellness period").

91.   There is no limit to the number of benefit periods a patient can have.

92.   However, once a benefit period ends (which, as described above includes the sixty day wellness period), the patient must have another three day qualifying hospital stay to generate another 100 days of skilled nursing facility benefits.

**b. RUG levels**

93.   The Prospective Payment System ("PPS") is a method of reimbursement in which Medicare payment is made based on a predetermined, fixed amount.

94.   Under the PPS system, the amount of payment for a particular service is based on how that service is categorized.

95.   Rehabilitation therapy is classified by different Resource Utilization Group ("RUG") levels.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

96.   The PPS system categorizes the RUG levels into separate levels; some of which pertain to rehabilitation services, while others pertain to nursing services.

97.   Patients requiring physical, occupational, and/or speech therapy are generally assigned to the special rehabilitation category, which is the type of therapy that Defendants provide to their Medicare Part A patients.

98.   From this special rehabilitation category, the rehabilitation levels are further broken up into five sub-categories: Low (RLx), Medium (RMx), High (RHx), Very High (RVx), Ultra High (RUx).

99.   The first two letters of sub-category pertain to the rehabilitation level (For example, RU means Ultra High.).

100. The third letter of the sub-category pertains to the level of nursing required, these are usually denoted by the letters x, g, or l.

101. The level of therapy usually corresponds with the level of nursing assistance required for in basic functions (also called Average Daily Living or "ADL" scores).

102. Thus, if a patient requires a high level of ADL nursing care, then that patient will likely also require a high level of rehabilitation therapy.

103. The five sub-categories vary in intensity, ranging from as low as seventy-five minutes of rehabilitation therapy per week at the Low RUG level of therapy, increasing up to 720 minutes or more per week at the Ultra-High level.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

104. The RUG level determines the amount of money per day that Medicare will pay for a patient's stay at the facility.

105. Higher RUG levels command higher Medicare reimbursements.

106. Generally, HMO and Medi-Cal provide lower reimbursements than Medicare for the corresponding Medicare levels of treatment.

   **i.   Process for assigning RUG levels**

107. Assigning a patient to a particular RUG level requires a certain process.

108. First, the patient must have a qualifying treatment, such as a three night overnight stay at a hospital.

109. Second, a doctor must write an order for the patient to attend a nursing home facility, such as Riverside.

110. Usually, a patient in need of rehabilitation therapy is someone who needs physical assistance (for example, a patient that breaks his or her hip).

111. However, at Riverside, Defendants admit patients suffering from other ailments – such as a stomach ulcer or scabies – and place them on rehabilitation therapy.

112. While the patients suffering from these conditions may have met the first two qualifications (a three night overnight hospital stay and a doctor's order) such patients should not be placed on rehabilitation therapy if it is not required by the patient's clinical needs.

113. Defendants frequently place these types of in appropriate patients on Ultra High rehabilitation therapy.

114. Third, in most skilled nursing home facilities, a physical therapist examines the patient to determine if it is clinically appropriate to place the patient on rehabilitation services.

115. At the same time, a nurse is required to evaluate the patient and complete a minimum data set report ("MDS").

116. An MDS is completed for each patient on several set days throughout their stay (specifically, the 5th, 14th, 30th, 60th, and 90th day of a patient's stay).

117. The MDS report includes the level of self-performance of the patient and the support that each patient needs with eating, bed mobility, toileting, and transfers; these four needs are referred to as the ADL score.

118. A lower ADL score generally represents an independent patient, while a higher ADL score generally represents a totally dependent patient.

119. The MDS, which includes the ADL score, reflects the level of therapy each patient receives.

120. A patient with a high ADL score, meaning the patient is nearly entirely dependent on help and is a good candidate for rehab, might require Ultra High rehabilitation therapy.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

### c.  Medi-Cal Regulations

121. Medi-Cal, California's Medicaid program, is a public health insurance program which provides needed health care services for low-income individuals.

122. Medi-Cal is financed equally by the State and by the federal government.

123. The California Department of Health Care Services is the state agency responsible for administering the Medi-Cal plan.

124. Because, as described above, a patient's Medicare benefits may exhaust, a patient may supplement his or her health insurance with private insurance or Medi-Cal.

### d.  Kickbacks and Self-Referrals

125. The Stark Act generally prohibits a physician (or their family members) from referring Medicare patients to entities in which the physician has a prohibited financial interest.  *See* 42 U.S.C. § 1395nn(a)(1).

126. For the purposes of the Stark Act, a financial interest is one in which the physician has an ownership or investment interest in the entity or has a compensation arrangement with the entity.  *See id.* at § 1395nn(a)(2).

127. Stark violations render the provider totally ineligible for compensation, and therefore providers are not entitled to any reimbursement from the Government, even for services that are properly performed.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

128. The Anti-Kickback Statute prohibits any person or entity from offering or paying any remuneration to induce, or reward, any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(g).

129. The Anti-Kickback Statute not only prohibits outright bribes and rebate schemes, but also prohibits offering inducements or rewards that has as one of its purposes to induce a physician to refer patients for services that will be reimbursed by a federal health care program.

130. Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under Medicare.

131. Accordingly, claims for reimbursement for inpatient or outpatient services under these programs that are the result of referrals tainted by kickbacks, are false claims and are not entitled to reimbursement.

## I.  Factual Allegations Corporate Defendants' Management Structure

### a.  Each Rockport facility has at least one administrator and one marketer.

132. Each Rockport facility has at least one, and in some instances, more than one administrator that oversees the facility's day-to-day functions.

133. In general, almost all Riverside directors or management report to a Rockport employee.

26

134. Most Riverside employees feel as though Rockport employees are their supervisors.

135. Sometimes Riverside employees would go straight to Rockport's Vice President of Operations Aneta Ayrapetyan or Rockport's Chief Operating Officer Aaron Robin to report complaints.

136. Riverside has had several different administrators over the last few years.

137. The various directors and business office managers at each facility report to the facility's administrator.

138. Administrators are responsible for ensuring that department managers are managing their respective departments.

139. Administrators are also responsible for marketing to Medicare patients to ensure that they came to Riverside.

140. In 2011, Cary Von Boxtel served as Riverside's administrator.

141. From December 2011 through June 2012, Christopher Romney (Mitt Romney's nephew) served as Riverside's administrator.

142. Romney left Riverside to take another administrator position at Plum Healthcare.

143. From June 2012 through March 2014, Micah Rhead served as Riverside's administrator.

27

144.  In March 2014, Rockport promoted Rhead to Regional Administrator, a position similar to Ayrapetyan's role as Vice President of Operations.

145. In early 2014, Rhead left Rockport to take another healthcare related job.

146. From March 2014 through September 2014, Raj Desai served as Riverside's administrator.

147. Due to conflicts with Department Managers, Ayrapetyan offered Desai a position at Northpoint Healthcare, another Rockport facility.

148.  From September 2014 through November 2014, Cathy Campbell served as the Interim Administrator at Riverside.

149. Several years ago, Campbell trained Aneta Ayrapetyan and Aaron Robin to be administrators.

150. From about June 2013 to the present, Campbell has floated around and worked at several other Rockport facilities including Skyline.

151. From November 2014 through May 2015, Corey Tillman served as Riverside's administrator.

152. Tillman previously worked at a Country Villa Health Services facility in San Bernardino that Rechnitz had recently purchased.

153. Tillman left because as she told Brenda Ponce, Assistant Business Office Manager, that she could no longer handle Ayrapetyan and Robin.

154. Each facility under Rockport also has one marketer.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

155. The marketers report to Joy Smith and Lynn Naivson, Rockport's Regional Business Directors.

**b.  Each administrator reports to Rockport's Vice President of Operations.**

156. Each of the facility administrators reports to Rockport's Vice President of Operations, Ayrapetyan.

157. Ayrapetyan has been a Vice President of Operations for Rockport the entire time Orozco was employed by Riverside.

158. Ayrapetyan oversees other Rockport facilities including: Fresno, Mesa Verde, Oakhurst, Montecito, Orange Healthcare, Alta Vista, and North Point Healthcare & Wellness Centre.

**c.  Rockport's Vice President of Operations reports to Rockport's Chief Operating Officer.**

159. Ayrapetyan in turn reports to Aaron Robin, the Chief Operating Officer of Rockport.

160. Robin has been the Chief Operating Officer of Rockport the entire time Orozco was employed by Riverside.

161. After serving as Interim Administrator at Riverside, Campbell moved to an administrator position at Skyline Healthcare, to work alongside Robin.

29

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

### d. Rechnitz hires certain managers at Riverside; Rockport's Vice President of Operations, Rockport's Chief Operating Officer, and Rockport's Regional Business Director all report to Rechnitz.

162. In or around February 2011, Rechnitz directly hired Joy Smith to work as Admissions Director at Riverside.

163. A few months later, Rechnitz promoted Smith to the position of Sales and Marketing Director.

164. Around this time, Riverside Administrator Chris Romney hired Leah Pennachio as the Admissions Director of Riverside.

165. In June 2013, Rechnitz promoted Smith to the position of Regional Business Director for Rockport.

166. Robin, Ayrapetyan and Smith report directly to Rechnitz, the owner of the entire empire.

167. Additionally, Ayrapetyan often consults with Rechnitz for his approval on certain major purchases or raises.

### e. Each Rockport facility pays certain doctors to serve as "Medical Directors" and "Quality Assurance Directors."

168. Each facility also has a number of doctors who serve as "Medical Directors" and "Quality Assurance Directors" for the facility even though they are not employed by the facility, or Rockport.

169. As the medical directors are not employees of Rockport, they do not report directly to anyone in Rockport's management chain.

170. During Orozco's time at Riverside, Dr. Gamal Ghaly, Dr. Joel Pengson, and Dr. Ghasan Tabel were Riverside's medical directors.

171. All three doctors also serve as physicians at the following nearby hospitals: Parkview Community Hospital, Riverside Regional Medical Center and Riverside Community Hospital.

172. The doctors are primarily responsible for examining patients at Riverside, but the doctors often did not come to Riverside to examine patients.

173. Dr. Pengson was Riverside's Quality and Assurance Director.

174. In this role, Dr. Pengson met with Riverside directors on a monthly basis to discuss various issues in the facility, including patient concerns, housekeeping, dietary needs, admissions, and any other issues relevant to the facility's quality measures.

175. Riverside, in addition to paying Drs. Ghaly, Pengson, and Tabel monthly salaries, would also pay these doctors cash bonuses as incentives to refer more Medicare patients.

176. Rockport provided Drs. Ghaly, Pengson, and Tabel with 1099s for their salaries.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

177. Riverside's Administrator Micah Reed told Orozco that it was illegal to give cash to doctors so to not document providing cash to the doctors.

178. Rockport's Regional Business Director Joy Smith initially asked Orozco for cash to provide to the doctors for their bonuses but Orozco did not have enough cash in the petty cash funds so Smith used her own money and then sought reimbursement from Riverside.

179. In or about June or July 2011, Ayrapetyan asked Orozco for cash from the petty cash. Orozco told Ayrapetyan that she needed a receipt for her records.

180. Since the cash was being used to pay doctors, Ayrapetyan told Orozco to "get creative" and make up receipts reflecting that Riverside was purchasing wheelchairs or purchasing food for the staff.

181. When Rhead began as Riverside's Administrator in June 2012, he was aware that Riverside was paying doctors cash and creating fake receipts but was not concerned as to how the money was spent but rather just that the transaction was somehow documented.

**f.  Rockport employees have control over Riverside's primary bank account.**

182. Rockport maintains one primary bank account at The Riverside Private Bank, located in Riverside, California.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

183. Orozco, as Riverside's Business Office Manager, had access to the bank account, primarily to make deposits from the Accounts Receivable department. For any other tasks related to the bank account, Orozco had to contact certain Rockport employees.

184. Several Rockport employees had access to Riverside's bank account including: Rockport Accounts Payable Manager Cheryl P. Martinez; Margie de Guzman (title unknown); Denise Gabault (Accounts Receivable Manager)

185. Orozco frequently saw Riverside's bank statements.

186. Orozco noticed that Riverside made reoccurring transfers to Jonathan Weiss's American Express card (Weiss partially owns Riverside and has interests in several other Rockport facilities.).

**g. Rockport trains the employees of Riverside and other facilities on accounting practices and also approves any major purchases.**

187. When Orozco first started working at Riverside, Tran (last name unknown), Accounts Receivable/Payroll for another Rockport facility, Skyline, trained Orozco.

188. Tran trained Orozco at the Skyline location on accounting practices for approximately four days; Skyline and Riverside perform essentially the same accounting practices.

189. All expense reports from Skyline and Riverside employees are sent to Rockport, which issues reimbursement checks to the employees.

190. Tran instructed Orozco to be careful in reviewing expense reports and receipts because Rockport's Vice President of Operations Aneta Ayrapetyan reviews the expense reports and receipts.

191. Tran told Orozco that expense reports and any receipts should not include any references to expense related to doctors.

192. At the time, Orozco reported to Riverside's administrators: Christopher Romney.

193. Orozco was responsible also for handling Riverside's petty cash.

194. To obtain petty cash, Orozco would request a check from Rockport. Rockport then made out the check to the administrator .

195. The administrator cashes the check to obtain petty cash.

196. Riverside does not renew its petty cash funds automatically, but uses roughly $3,000 every two weeks, at which point Rockport issues the administrator a new check.

197. Orozco maintained a petty cash log on an electronic spreadsheet on the Accounts Payable computer.

198. The log was saved on Riverside's Global drive (often referred to as the "G drive").

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

199. Riverside's administrators sign the petty cash log and send a scanned copy to Rockport.

200. If Riverside needs to obtain a check for a non-routine purpose, Riverside would send an e-mail to Ayrapetyan and Robin and Jonathan Weiss.

201. However, Weiss has to approve the check.

202. After about a month in the Business Office position, Rockport's Vice President of Operations Aneta Ayrapetyan determined that Orozco required additional accounting training.

203. Ayrapetyan instructed Orozco to travel to Rockport's facilities to obtain additional training from Rockport's billing consultant, Ann Dixon.

204. In 2012, Orozco traveled twice to Rockport's Los Angeles location (the Fairfax building) for training.  Orozco met Rockport CFO Brad Gibson during these trainings.

205. In 2014, Orozco again traveled twice to Rockport's Los Angeles location (this time at the Wilshire building).

206. Generally, every Riverside director or supervisor (except for the registered nurses) travels to Rockport's Los Angeles location for job-specific training. Some RN's like the DON travel to training.

207. Rockport employees communicate with Riverside employees by telephone, e-mails, and text messages.

208. In or around 2013, in addition to working at Riverside, Orozco worked part-time at Orange – another Rockport facility also managed by Ayrapetyan.

209. Orozco performed the Accounts Payable and payroll at Orange.

210. Orange's Accounts Receivable Representative Rosa (last name unknown) trained Orozco on Orange's accounting practices; Orozco used those same practices at Riverside.

211. Later, Orozco returned to Orange to train Lisa Iopu and then to train Nayeli Bahena on Rockport's accounting practices.

212. At Orange, Orozco witnesses the accounting department make fake receipts in a similar manner as at Riverside.

213. Ayrapetyan instructed Orozco to go to Orange as much as possible to provide additional training and guidance.

214. Orozco frequently spoke with Orange's Business Office Manager Angie Rivera about Orange's accounting practices, which were nearly identical to Riverside's.

215. On at least two occasions, Orozco witnessed Orange's marketer request a cash reimbursement for money she spent buying gifts for doctors, and made a fake receipt indicating that the cash, approximately $300, was spent to pay the facility gardener, when in fact the cash was used to reimburse the marketer for gifts for doctors.

**II. Defendants Engage in a Wide-Spread, Systematic, Corporate Kickback Scheme to Defraud Medicare.**

216. Defendants engage in an illegal scheme to provide doctors and case managers with cash, gifts, and numerous other incentives in return for Medicare patient referrals.

217. Defendants also provide these incentives directly to patients to encourage Medicare patients to stay at the facility longer than necessary.

218. Corporate Defendants hire marketers to entice doctors and hospital case managers to refer Medicare patients to their facilities. In or around June 2013, Rechnitz hired Joy Smith as a marketer for Riverside; Smith reported to Rechnitz and Rockport's Chief Operating Officer, Aaron Robin.

219. Orozco also saw that Smith's employment application listed that Rechnitz referred Smith.

220. Rechnitz hired Smith at a pay rate of approximately seventy eight dollars an hour, not including bonuses.  In 2013, Orozco went on a job interview at Villa Healthcare, another health care provider owned by North American Health Care, Inc. and not associated with Rockport.

221. During the interview, North American Health Care Inc.'s Administrator Jeremy Jergensen asked Orozco if she knew Smith, and Orozco replied that she did.

222. Jergensen said, "She's very well-known I hear and was hired directly by Shlomo [Rechnitz], right?" or words similar.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

223. Additionally, Riverside's former case manager, Ted Johnson, disliked Smith and frequently complained to Orozco and other Riverside employees that he could not do anything contrary to Smith's instruction because Rechnitz hired her.

224. Smith would often tell people that Rechnitz hired her and that Aaron Robin, Rockport's Chief Operating Officer, was not her boss.

225. As a marketer, Smith's job was to get local doctors to refer Medicare patients to Riverside.

226. Smith would often tell Riverside employees that "we only want Medicare" patients admitted into the facility.

227. Since Orozco processed the expense reports, Orozco saw that Smith often spent close to $10,000 in marketing expenses every few weeks.

228. In or about 2013, Rockport Accounts Payable Manager, Cheryl Martinez, told Orozco that Rockport Chief Operating Officer Aaron Robin had requested that Smith's expense reports be provided directly to him.

229. Ayrapetyan told Orozco not to mess with Smith because Rechnitz hired her.

230. When Rechnitz hired Smith, Riverside had only five Medicare patients.

231. However about a year later, due to Smith's marketing efforts, Riverside had about twenty Medicare patients.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

232. As Smith proved how successful she was at getting doctors to refer Medicare patients, in or around 2013, Rechnitz moved Smith to market for other facilities including Orange Healthcare, Mesa Verde and Santa Ana.

233. Ultimately, Smith was promoted to Regional Business Director, along with Lyn Naivson to oversee all of the marketers at the various Rockport facilities.

234. Approximately every Friday, Smith visits Riverside to attend marketing conference calls or marketing events.

235. If Riverside hosts any events or open houses with potential referral sources, Smith attends.

236. In July 2012, Aaron promoted Admissions Director Leah Pennachio to the position of marketer for Riverside.

237. Pennachio often used the company's Sam Club card, petty cash and her personal credit card to buy gifts and requested items for doctors, patients, and case managers.

238. In April 2013, Rhead hired Lane Marine to replace Pennachio as the marketer for Riverside.

239. Pennachio and Smith trained Marine for the position of marketer.

240. But Marine left after a few months because she did not feel comfortable giving cash to doctors.

241. After Marine, in or about March or April 2013, Smith hired Kristie Bednar as the marketer, but Bednar also left after a few months because she did not like Riverside's marketing practices and felt a lot of pressure from Smith to secure Medicare patients for Riverside.

242. In August 2014, Smith hired Mario Pena as the marketer and Pena has remained in that position.

243. Marketers spend significant amounts of money to entice doctors to refer Medicare patients; Riverside creates fake receipts for marketing expenditures When Smith was first hired, Smith would submit her expense reports to the administrator, Chris Romney then Rhead, to review and approve.

244. A few months after Smith began submitting expense reports, Rhead raised concerns about how much money Smith was spending.

245. Shortly after Rhead raised concerns, Robin told Rhead that Smith could purchase what she wanted, and Robin would be reviewing and approving Smith's expense reports from then on.

246. All marketers since Smith require pre-approval by Ayrapetyan to purchase items, or spend money.

247. Once the marketer purchases the item, or pays for the event, the marketer submits an expense report to the administrator for review and then to

Orozco for processing. Smith and Pennachio created their own fake receipts for gifts purchased with cash to give to the doctors and case managers.

248. Pennachio came up with the idea of creating receipts indicating the cash was used to buy items like cupcakes or muffins for the patients.

249. After Pennachio left, Ayrapetyan instructed Orozco to continue creating fake receipts to account for the cash the facility used for marketing gifts.

250. After Pennachio, Riverside's marketers felt uncomfortable creating fake receipts, so Ayrapetyan, Pennachio, Desai, and Tillman told Orozco to create fake receipts indicating the cash was used to purchase items required by the patients such as wheelchairs, muffins, and cupcakes.

251. In or around 2014, Ayrapetyan told Orozco to "get creative" for larger amounts because they could not justify so much money spent on wheelchairs as there were actually very few wheel chairs at Riverside.

252. Ayrapetyan also instructed Orozco to revise any expense reports or receipts that referenced marketing expenses by using White-Out and then inserting "employee benefits."

253. In or about 2012, Ayrapetyan sent an e-mail to all of the Accounts Payable representatives of all of her facilities instructing them correct expense reports to reference employee benefits before turning them in.

254. Smith's expense reports are still submitted directly to Robin.

41

255. Later, in June 2014 when Riverside promoted Orozco from the position of Accounts Payable Representative to Business Office Manager, David Rodriguez filled the position of Accounts Payable Representative.

256. Rodriguez felt uncomfortable making fake receipts.

257. Rodriguez told Orozco, "I'm making $13 an hour and I'm going to go to jail for this" or words to the same effect.

258. On one occasion, Pennachio purchased a laptop for Dr. Pengson on her husband's credit card and submitted an expense report requesting reimbursement for the purchase.

259. Christy Layug, who worked for Rockport, questioned the purchase because she thought it was suspicious that the marketer was buying a laptop for a doctor.

260. When Christy raised concerns about this purchase, Rockport's Chief Operating Officer Aaron Robin got involved, approved the expense report, and told Christy not to question the expenses any more.

261. Rockport's Accounts Payable Manager Cheryl Martinez ultimately fired Christy for asking too many questions about the expense reports submitted by the marketers.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**h. Corporate Defendants provide doctors with cash, a salary, bonuses, hotels, gifts, and attractive women in exchange for Medicare patient referrals.**

### i. Dr. Gamal Ghaly

262. Dr. Gamal Ghaly is one of Riverside's medical directors who also has a private practice where he sees patients at a facility next to Parkview Community Hospital. When Smith was Riverside's marketer, Smith introduced Dr. Ghaly to Riverside as she and Dr. Ghaly are very close.

263. Riverside pays for Dr. Ghaly's daughter's birthday parties, hotels, and anything else Dr. Ghaly needs.

264. Dr. Ghaly refers a large number of Medicare beneficiaries to Riverside.

265. In fact, according to Orozco, while Dr. Ghaly refers private insurance and long- term care patients to other facilities, including Citrus, Dr. Ghaly exclusively refers his Medicare patients to Riverside.

266. Dr. Ghaly works at Riverside approximately one day a week to review and complete most of Riverside's patients' chart notes.

267. In return for Dr. Ghaly's referrals and his one day of week of chart review at Riverside, Riverside pays Dr. Ghaly a salary of $4,000 per month, a bonus based on how many referrals Dr. Ghaly provides (usually amounting to about $1,000 a month).

268. Riverside also takes Dr. Ghaly out for the evening to dinners and other social events.

269. Riverside pays Dr Ghaly's medical director fees through its Accounts Payable department using a check.

270. Smith, or other Riverside marketers, provides Dr. Ghaly with cash for his bonuses.

271. On several occasions, Dr. Ghaly spoke with Orozco directly requesting payment of his $4,000 monthly salary.

272. Riverside also pays for expensive gifts, parties, and other items for Dr. Ghaly.

273. Riverside hires attractive young females to handle admissions to entice Dr. Ghaly to continue to refer Medicare patients to Riverside.

274. Smith, Ayrapetyan, and Robin tell admissions employees that they have to go out with Dr. Ghaly as part of their job duties.

275. Smith, Ayrapetyan, and Robin also tell the admissions employees that they have to pick up the tab for whatever Dr. Ghaly wants to do for the evening.

276. In or about December 2013, Ayrapetyan sent an e-mail to several directors at her various facilities instructing them on how to draft expense reports when they took doctors out to meals.

277. The women in Admissions are told to pay in cash and bring in their receipts to be reimbursed for their expenditures.

278. In 2013, when Pennachio was the Admissions Director, went on dates with the doctors.

279. Sometimes it is the marketers, specifically Pena, who will take Dr. Ghaly out.

280. When this happens, Pena pays for the events on his corporate credit card.

281. As Smith rose higher up the chain and took on more responsibilities, Pena was promoted to oversee admissions and marketing at Riverside.

282. Pena instructs the admissions employees at Riverside that they must go out with, and pay for, Dr. Ghaly as well.

283. In August 2014, Riverside promoted Dinorah ("Erica") Hamilton from the position of Receptionist/Admissions Assistant to the position of Director of Admissions.

284. Robin came to Riverside to speak with Hamilton, and take her out to dinner.

285. At dinner, Robin told Hamilton that in order to be Director of Admissions, she needed to go on dates with doctors.

286. Robin then insisted that Hamilton drink more and offered her to stay at the same hotel that he was staying but Hamilton refused.

287. After dinner, Hamilton called her former supervisor, Pennachio.

288. Pennachio told her that if she could not handle taking doctors out and being hit on, to not take the position because that is what the position entailed.

289. Hamilton went on dates with doctors but when things got out of hand, she complained to Tillman, Riverside's administrator at the time.

290. Tillman told Hamilton that she was not performing well and Hamilton responded that she did not feel comfortable going on dates.

291. Tillman told Hamilton that she was naïve because "she did not know what she had" or words similar.

292. Smith also personally called Hamilton and sent her text messages asking her to go on dates with doctors.

293. In or around December 2014, Riverside demoted Hamilton to the position of Receptionist when Hamilton complained to Smith that Dr. Ghaly grabbed her butt when they were out one evening, and told Smith that she could only go out with Dr. Ghaly twice a week, and could no longer go out with Dr. Ghaly every night.

294. Orozco also told Assistant Administrator Martindale that Dr. Ghaly grabbed Hamilton's butt while the two were out one night.

295. Martindale brushed off Orozco's comment and said "he grabs everyone's ass.  Just tell him not to and he won't do it again."

296. After Smith demoted Hamilton, Smith paid for Hamilton's replacement, Rebecca Brizuela, to dye her hair blonde, as Dr. Ghaly prefers blondes.

### ii.    Dr. Joel Pengson

297.   Dr. Joel Pengson is another medical director at Riverside who sees patients primarily at Parkview.

298. In addition to his role as medical director, Dr. Pengson has traditionally referred Medicare beneficiaries to Riverside.

299. Dr. Pengson is supposed to work at Riverside at least once a week, but usually only comes into the facility once a month.

300. When Dr. Pengson is at Riverside, Dr. Pengson reviews and signs off on patient charts.

301. In return for Dr. Pengson's referrals and patient chart reviews, Riverside pays Dr. Pengson a salary of $4,000, and a bonus based on how many referrals Dr. Pengson provides.

302. Dr. Pengson has all but stopped referring his Medicare patients to Riverside, and now sends the majority of his Medicare patients to Mission Care Center, a skilled nursing facility owned by Sun Mar Management Services, where Riverside's former administrator Micah Rhead currently works.

303. Despite Dr. Pengson's diminished referrals, Riverside continues to pay Dr. Pengson his $4,000 a month salary as well as provides various perks for Dr. Pengson and his family.

304. In or about 2014, Rhead complained to Rockport Chief Operating Officer Aaron Robin that Dr. Pengson should not receive a full salary and a bonus because he was no longer referring as many Medicare patients as the other doctors.

305. Robin instructed Riverside to continue paying Dr. Pengson because he referred to other Rockport facilities.

306. Riverside donates money to Dr. Pengson's charity, Christian Action for Reconciliation and Evangelism Philippines, and gives expensive gifts to Dr. Pengson's wife.

307. Orozco recalls that one time, Dr. Pengson wanted an iMac desktop computer for his birthday, so Riverside's marketer at the time, Leah Pennachio, bought him one.

308. In addition to receiving gifts personally, the marketers give gifts to the doctors' wives.

309. Smith and Dr. Pengson's wife are close friends and Smith often buys Mrs. Pengson designer sunglasses, purses, scarves, and electronics.

310. Dr. Pengson and Dr. Ghaly also have charity fundraisers every year to which Riverside donates money.

### iii.    Ghasan Tabel

311. Dr. Ghasan Tabel is another medical director at Riverside who primarily sees patients at Parkview, and also works as Riverside's quality assurance director.

312. Dr. Tabel has also all but stopped making referrals to Riverside, and hardly ever works at the facility anymore.

313. Dr. Tabel usually just refers one to two patients a month and sends his nurse practitioner Linda LNU to come in briefly to check on the few patients he currently has at Riverside.

314. Dr. Tabel also requested that his long term care patients be sent to another facility, since Riverside no longer wants to treat long-term care patients.

315. In return for Dr. Tabel's referrals and patient care, Riverside used to pay Dr. Tabel a salary of $4,000 a month, but now only pays Dr. Tabel a salary of $2,000 a month.

316. In addition to a monthly salary, Riverside pays Dr. Tabel a bonus based on how many referrals Dr. Tabel provides.

317. Patients are usually assigned to the doctor that referred the patient.

318. As a result, the majority of Riverside's patients are seen by Dr. Ghaly, who refers the most patients.

319. The doctors are given bonuses if their referrals help Riverside in meeting its internal Medicare enrollment goal.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

320. Robin and Ayrapetyan approve all gifts and cash given to doctors.

321. In addition to the salaries, cash bonuses, drinks, dinners, parties, and charity contributions Riverside pays to the doctors, Riverside also pays for the doctor's hotel rooms, limo service to special events, dry cleaning, golf outings, laptops, car washes, and valet services among other items, services, and goods.

322. Orozco states that Riverside pays for everything for these doctors on top of the salary that Riverside pays the doctors for acting as Medical Directors.

### i.   Corporate Defendants provide hospital case managers with gifts and cash in exchange for Medicare patient referrals.

323. Case managers at hospitals and other medical facilities are supposed to present a list of options of skilled nursing facilities to the patient or the patient's family, and ask the patient and family to make a decision about what skilled nursing facility the patient would like to go to.

324. The case managers that work with Rockport's marketers do not present a choice of facility to the patient or the patient's family.

325. Instead, case managers tell patients that they need skilled nursing care so that patients will have to go to Riverside or one of the other Rockport facilities.

326. Parkview Community Hospital is located behind Riverside's parking lot; Riverside Community Hospital and Riverside Medical Center are also located nearby.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

327. Marketers from Riverside used to bring gift cards and gift baskets to the case managers at Parkview and Riverside Community Hospital, Riverside Medical Center and Kaiser in Moreno Valley and Riverside.

328. Riverside purchased many gifts, gift cards, and gift baskets from Sam's Club for patients, doctors, and case managers.

329. Riverside had its own corporate account at Sam's Club and provided the following employees with cards: Administrator Micah Rhead, Admissions Director Leah Pennachio, Business Office Manager Neyirys Orozco, Central Supply Director Yocelin Perez, and Staff Development Director Hannah Abrillo.

330. Orozco had two Sam's Club cards and often times, upon the direction of Rhead, allowed other employees use her Sam's Club card to purchase items for Riverside.

331. The following excerpts show some of the gift-related purchases made on Riverside's Sam's Club account:

SAM'S CLUB DIRECT
P.O. BOX 530930
ATLANTA, GA 30353-0930

ALTA VISTA HEALTHCARE
Account: 0402 53856768 6
Club/Name: 4709

Date of Sale: 12/07/12
Invoice: 009548
P.O.:
Buyer: LEAH PENNACCHIO

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|---|---|---|---|---|---|
| 005976326 | OLIVE GARDEN GC $25 | 2.00 | EA | 24.64 | 49.28 |
| 022182657 | $50 HOLIDAY MC | 1.00 | EA | 53.88 | 53.88 |
| 026773259 | VANILLA MCARD $75 MP | 5.00 | EA | 83.94 | 419.70 |

**SAM'S CLUB DIRECT**
P.O. BOX 530930
ATLANTA, GA 30353-0930

ALTA VISTA HEALTHCARE
Account : 0402 53856768 6
Club/Name: 4709

Date of Sale: 11/19/12
Invoice: 003822
P.O.:
Buyer:     HANNAH ABRILLO

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|---|---|---|---|---|---|
| 024168196 | MCARD HISPANIC $50 | 2.00 | EA | 53.88 | 107.76 |
| 025735801 | $30 AMC / LOWES MP | 1.00 | EA | 29.48 | 29.48 |
| Subtotal: 137.24 | | Tax: 0.00 | | Balance Due: | 137.24 |

**SAM'S CLUB DIRECT**
P.O. BOX 530930
ATLANTA, GA 30353-0930

ALTA VISTA HEALTHCARE
Account : 0402 53856768 6
Club/Name: 6378

Date of Sale: 04/25/13
Invoice: 008691
P.O.:
Buyer:    NEYIRYS OROZCO

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|---|---|---|---|---|---|
| 022182562 | $100 HOLIDAY MC | 1.00 | EA | 105.38 | 105.38 |
| 022182657 | $50 HOLIDAY MC | 1.00 | EA | 53.88 | 53.88 |
| 026055331 | SPA WEEK MP $100 | 1.00 | EA | 79.98 | 79.98 |

**SAM'S CLUB DIRECT**
P.O. BOX 530930
ATLANTA, GA 30353-0930

ALTA VISTA HEALTHCARE
Account : 0402 53856768 6
Club/Name: 4709

Date of Sale: 11/26/12
Invoice: 001657
P.O.:
Buyer:     HANNAH ABRILLO

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|---|---|---|---|---|---|
| 021960203 | EUROPEAN COOKIES | 3.00 | EA | 9.98 | 29.94 |
| 022182657 | $50 HOLIDAY MC | 2.00 | EA | 53.88 | 107.76 |
| 028773259 | VANILLA MCARD $75 MP | 1.00 | EA | 83.94 | 83.94 |
| Subtotal: 221.64 | | Tax: 0.00 | | Balance Due: | 221.64 |

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**SAM'S CLUB DIRECT**
**P.O. BOX 530930**
**ATLANTA, GA 30353-0930**

ALTA VISTA HEALTHCARE
Account :    0402 53856768 6
Club/Name:   4709

Date of Sale:   12/05/12
Invoice:        005787
P.O.:
Buyer:          HANNAH ABRILLO

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|--------|-------------|----------|------|-------|-----------|
| 022182657 | $50 HOLIDAY MC | 1.00 | EA | 53.88 | 53.88 |
| 028773259 | VANILLA MCARD $75 MP | 2.00 | EA | 83.94 | 167.88 |
| Subtotal: 221.76 | | Tax:  0.00 | | Balance Due: | 221.76 |

**SAM'S CLUB DIRECT**
**P.O. BOX 530930**
**ATLANTA, GA 30353-0930**

ALTA VISTA HEALTHCARE
Account :    0402 53856768 6
Club/Name:   4709

Date of Sale:   12/05/12
Invoice:        005775
P.O.:
Buyer:          HANNAH ABRILLO

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|--------|-------------|----------|------|-------|-----------|
| 005592102 | 8.5X11 20# 92 BRIGHT | 2.00 | EA | 27.88 | 55.76 |
| 028773259 | VANILLA MCARD $75 MP | 1.00 | EA | 83.94 | 83.94 |
| Subtotal: 139.70 | | Tax:  4.32 | | Balance Due: | 144.02 |

**SAM'S CLUB DIRECT**
**P.O. BOX 530930**
**ATLANTA, GA 30353-0930**

ALTA VISTA HEALTHCARE
Account :    0402 53856768 6
Club/Name:   4709

Date of Sale:   12/07/12
Invoice:        009550
P.O.:
Buyer:          LEAH PENNACCHIO

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|--------|-------------|----------|------|-------|-----------|
| 022182657 | $50 HOLIDAY MC | 16.00 | EA | 53.88 | 862.08 |
| Subtotal: 862.08 | | Tax:  0.00 | | Balance Due: | 862.08 |

**SAM'S CLUB DIRECT**
P.O. BOX 530930
ATLANTA, GA 30353-0930

ALTA VISTA HEALTHCARE
Account :   0402 53856768 6
Club/Name:  4709

Date of Sale:   12/07/12
Invoice:        009552
P.O.:
Buyer:          MICAH RHEAD

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|--------|-------------|----------|------|-------|------------|
| 028773259 | VANILLA MCARD $75 MP | 4.00 | EA | 83.94 | 335.76 |

Subtotal:   335.76          Tax:   0.00          Balance Due:   335.76

---

**SAM'S CLUB DIRECT**
P.O. BOX 530930
ATLANTA, GA 30353-0930

ALTA VISTA HEALTHCARE
Account :   0402 53856768 6
Club/Name:  4709

Date of Sale:   12/07/12
Invoice:        009547
P.O.:
Buyer:          LEAH PENNACCHIO

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|--------|-------------|----------|------|-------|------------|
| 028773259 | VANILLA MCARD $75 MP | 3.00 | EA | 83.94 | 251.82 |

Subtotal:   251.82          Tax:   0.00          Balance Due:   251.82

---

**SAM'S CLUB DIRECT**
P.O. BOX 530930
ATLANTA, GA 30353-0930

ALTA VISTA HEALTHCARE
Account :   0402 53856768 6
Club/Name:  4709

Date of Sale:   12/07/12
Invoice:        009555
P.O.:
Buyer:          MICAH RHEAD

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|--------|-------------|----------|------|-------|------------|
| 028773259 | VANILLA MCARD $75 MP | 1.00 | EA | 83.94 | 83.94 |

Subtotal:   83.94          Tax:   0.00          Balance Due:   83.94

---

**SAM'S CLUB DIRECT**
P.O. BOX 530930
ATLANTA, GA 30353-0930

ALTA VISTA HEALTHCARE
Account :   0402 53856768 6
Club/Name:  6619

Date of Sale:   12/17/12
Invoice:        008241
P.O.:
Buyer:          LEAH PENNACCHIO

| S.K.U. | DESCRIPTION | QUANTITY | UNIT | PRICE | EXT. PRICE |
|--------|-------------|----------|------|-------|------------|
| 022182562 | $100 HOLIDAY MC | 2.00 | EA | 105.38 | 210.76 |
| 024168190 | MCARD HISPANIC $50 | 1.00 | EA | 53.88 | 53.88 |
| 027964426 | AG DAISY POT $50 | 4.00 | EA | 53.88 | 215.52 |

Subtotal:   480.16          Tax:   0.00          Balance Due:   480.16

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

332. Orozco would process Riverside's Sam's Club bill.

333. Ayrapetyan told Orozco that she did not want to see purchases for wine, gift cards, and baskets as those would "raise a red flag."

334. Ayrapetyan instructed Orozco to create fake Sam's Club statements in excel to revise any entries or items that could be construed as gifts.

335. Ayrapetyan also instructed Orozco to shred the original Sam's Club statements.

336. At Riverside daily meetings, Ayrapetyan, Romney, Rhead, and Desai would instruct Perez, Pennachio, Kellen Vasquez and Orozco to go to Sam's Club and purchase large quantities of gift cards, between $500 and $1,000, for the marketers to give out for referrals.

337. Other times, when Orozco would go to Sam's Club to get office supplies for Riverside, Ayrapetyan, Rhead, and Desai would ask Orozco to purchase gift cards and bottles of wine for the marketers to give to case managers.

338. When Sam's Club stopped selling gift cards, Ayrapetyan, Rhead, and Desai instructed Perez, Orozco and the marketers to purchase gift cards from other stores such as the local grocery store called Staters Brothers.

339. Ayrapetyan, Rhead, and Desai instructed Perez, Orozco, and the marketers to always buy the gift cards in cash so Riverside could write the expense off as purchase for patient related items such as wheel chairs or cupcakes.

340. The gift cards the marketers would bring the case managers were often generic Visa or MasterCard gift cards, and some were for specific business such as Starbucks; the gift cards ranged in value from $25 to $500.

341. Ayrapetyan, Rhead, and Desai also instructed Perez to purchase groceries from Sam's Club for doctors and case managers providing referrals.

342. When the marketer visits Parkview, the marketer drops off the gifts and says something to the effect of, "This is for you, from us."

343. Or, the marketer specifically asks for the following Parkview case managers to provide them with the gifts: Sandra, Michelle, JC, Janell, Andrew, Mel, Myline, Sammy and Faith (last names unknown).

344. When the marketer visits Riverside County Regional Medical Center, the marketer specifically asks to speak with the following case managers to provide them with gifts:  Lyn, Debbie, Mayra Gallegos (Gallegos previously worked at Riverside and now works at Parkview).

345. Lyn would often make deals with Pena in exchange for Medicare patients.

346. It is primarily the marketer's job to bring gifts to Parkview, but occasionally the admissions staff brings the gifts to Parkview.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

347. Occasionally, if the marketers and Admissions staff were busy, Ayrapetyan would tell Orozco to walk over to Parkview and give gifts to the case managers.

348. In or around 2013, Smith came to Riverside and told the marketers that they were no longer allowed to go over to Parkview as there had been complaints of bribery at Parkview.

349. Smith instructed Riverside's marketers and employees that Parkview management had designated  Wednesdays as a specific day for marketers to meet and greet the staff.

350. Smith told the marketers that to avoid issues at Parkview the marketer should go over to Parkview and ask the case managers out to dinner or happy hour with the marketers.

351. Once the marketers were out to dinner or drinks with the case managers, the marketer would give the case manager the gift cards, or other gifts.

352. Robin and Smith tell the marketers that they should take the case manager out to dinner or give the case manager a gift card for every single Medicare patient the case manager refers to Riverside.

353. Riverside marketers take the case managers and doctors to Sevillas in Riverside and Mission Inn in Riverside for dinner and happy hours, among other places; Riverside marketers always pay for these dinners and happy hours.

354. The marketers at Riverside also give gifts and throw happy hours for almost every single holiday, like St. Patrick's Day.

355. For Christmas, Riverside's marketers give larger gifts like Chanel make-up sets for the women and shaving kits for the men.

356. Recently, Smith instructed the women working in admissions at Riverside to take the female case managers to the spa.

357. More expensive gifts, such as purses, are given to case managers by Riverside's marketers to "motivate" them to provide more referrals.

358. Smith often submits expense reports with name brand purses listed.

359. On one occasion, Orozco remembers Smith submitted an expense report with a $3,000 name brand purse for a case manager.

360. Smith told Orozco to list the purse as "Director of Nursing's Birthday" even though Orozco knew that the Director of Nursing's birthday was months away.

361. Smith instructed Orozco to expense the purse this way because if the expense is attributable to an employee, Riverside can code the expense as an employee benefit, and there is nothing to say an employer cannot give their own employee a gift.

362. When Orozco saw this expense, Orozco made a comment to Rhead, the Administrator at the time, that the purse Smith bought was more than Orozco made in a month.

363. Rhead responded "we make $18,000 a month from Medicare patients."

364. After this comment, Orozco never complained about the marketer's expense reports again.

365. Parkview's Director of Case Management, George Martindale was aware of, and participated in, Riverside's practice of giving kickbacks to Parkview's case managers for referrals.

366. Martindale has gone out to dinner and drinks on numerous occasions with Riverside's marketers.

367. In or around March 2014, Martindale also used his connection as a referral source to get his son, Garrett a position as Assistant Administrator at Riverside so Garrett could complete his administrator training.

368. In 2015, George and Garrett Martindale went to Mardi Gras in New Orleans with Smith.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**j.   Defendants provide Medicare patients with gifts, food, and waive certain costs to persuade them to stay at the facility as long as possible.**

369. Defendants engage in a companywide, systematic scheme to keep patients on service for the 100-day maximum for which Medicare will pay for rehabilitation services.

370. Rhead and Desai told Riverside staff to do "whatever it takes" to ensure that Medicare patients remain at the facility.

371. Ayrapetyan, Rhead, Tillman, Desai, and the rest of Riverside staff, bribed patients who wanted to leave Riverside to stay at Riverside with promises of special food from restaurants, new televisions, shopping trips, rental payments, and other perks.

372. If a patient wants to leave, the staff is required to send an email to Ayrapetyan and Ayrapetyan will call one of the administrators and tell them to do whatever it takes to keep the patients at Riverside.

**i.   Defendants do not attempt to collect the 20% cost share required by Medicare.**

373. Medi-Cal requires that beneficiaries cover uncovered charges ("shared costs") before it will reimburse facilities for the cost of care.

374. For Medicare If the stay is for fewer than 20 days, there is no co-pay.

375. It is common for Riverside to waive the required 20% co-pay for rehabilitation services provided to Medicare beneficiaries.

376. If a patient at Riverside receives social security checks, Riverside will deposit the monthly check in the patient's trust account.

377. Riverside then transfers money from the patient's trust account to Riverside's main bank account, and posts that transaction to the patient's account to show Medicare that the patient paid the required 20% to Riverside.

378. Orozco, in her role as Riverside's Business Office Manager, was responsible for managing patients' trust accounts.

379. Even though Riverside completes this transaction, Riverside reimburses most Medicare patients with cash or checks made out to the patient personally.

380. In or about October 2014, when Campbell was serving as Interim Administrator at Riverside, Orozco attempted to collect coinsurance from a Medicare patient.

381. When Campbell learned this, Campbell went to Orozco's office and said "we don't collect on Medicare."

382. Orozco visited other Rockport facilities, including Orange and Skyline, and saw the accounting books which indicated to Orozco that all three other facilities implement the same strategy of waiving the 20% co-pay and Medi-Cal Share of Cost for Medicare patients.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

383. Orozco also spoke with the Business Office Managers at Orange and Bakersville who told her that Ayrapetyan's instructed them not to collect on Medicare patients.

384. Orozco knows this is true because the books at all the facilities have an "outstanding" note next to all of the Medicare patients.

385. A previous biller, Susan Rhea, complained to Rhead and Desai that when she tried to collect from patients after they were released, the patients would often tell her that Riverside  told them they would not have to pay anything.

386. Rhea had been at Riverside for sixteen years but ultimately left because Riverside was pressuring her to collect on 100% of its accounts.

387. Depending on the case, the administrator would put an administrative hold on the patient's account, and stop collection efforts.

388. On one occasion, when Orozco was first promoted to biller, Orozco was working on an accounts receivable project, and noticed that Rhea had placed an administrative hold on a number of accounts.

389. When Orozco asked Ayrapetyan about the administrative hold, Ayrapetyan told Orozco that administrative holds are placed on patient accounts for whom Riverside is not collecting the 20% co-pay and share of cost.

390. In or about September 2014, when Orozco asked why Riverside does not collect the 20% co-pay from these patients, Ayrapetyan replied "What's $152 a day when you're making $700 a day on the patient?"

391. Ayrapetyan, and Garrett Martindale who was also present, laughed at the comment.

392. During the time Orozco was Riverside's biller, Ayrapetyan instructed Orozco to not contact Medicare patients for shared costs or coinsurance until after they left the facility.

393. Once the patient left Riverside, Orozco was to make notes in the patient's file representing Riverside's collection efforts.

394. Ayrapetyan told Orozco to make minimal effort for collection of Medicare patients and that Riverside would just write the costs off.

**a) Riverside and Dr. Ghaly told patients that Riverside would not require them to pay their 20% share of costs.**

395. Dr. Ghaly, a doctor who works as a staff physician at nearby Parkview Community Hospital, tells Medicare patients that Riverside will not charge them for the shared costs.

396. Assistant Administrator at Riverside, Garrett Martindale, also tells Medicare patients that Riverside will not charge them for their share of costs.

397. Martindale gives the patients cash or checks.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

398. However, patients who want to leave Riverside are discouraged from leaving Riverside by being told that if the patient leaves they will be personally responsible for paying the entire cost of their stay at Riverside.

### ii.   Specific Examples

#### a)   Mr. E.[3]

399.   Orozco recalls one instance, in or around August 2014, where a patient, Mr. E, was approved to receive 100 days of rehabilitative care at Riverside.

400.   When Mr. E arrived at Riverside, Mr. E was told by Pena, Dr. Ghaly, and Martindale that he would only have to stay at Riverside for one month.

401. Mr. E was concerned because Mr. E's wife relied on his social security check.

402. Dr. Ghaly and Garrett Martindale informed Mr. E that because he and his wife both relied on his social security check, Mr. E would not be responsible for the shared cost that he would otherwise be required to pay as a Medi-Cal beneficiary.

403. Mr. E spoke with Orozco about not paying the share of costs and Orozco replied that she knew nothing about waiving the shared costs.

404. Mr. E complained to Martindale, Martindale told Orozco that Dr. Ghaly had told Mr. E that he would not have to pay shared costs for his care at Riverside.

---

[3]Patient names are abbreviated to maintain confidentiality.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

405. Because Dr. Ghaly, Martindale and Pena told Mr. E that he did not have to pay his share the cost of his care at Riverside, Mr. E paid for his share of the costs but then Riverside provided Mr. E a check for $1,300 to reimburse him.

406. Because Riverside reimbursed Mr. E after his first month at Riverside, Mr. E was convinced to stay for a second month.

407. Riverside reimbursed Mr. E's social security check to him after the second month of his stay.

408. At the end of the third month, when Mr. E was discharged, Riverside kept Mr. E's social security check to recoup some of the cost sharing Mr. E should have been responsible for, despite Riverside telling Mr. E that they would not collect the shared costs.

### b) L.D.

409. On another occasion, in or around July 2014, Orozco recalls contacting the son of patient L.D. by repeatedly calling him.

410. When the patient's son answered, the son told Orozco that Desai said his father did not have to pay the shared costs if he stayed at Riverside for two weeks.

411. Orozco told Ayrapetyan about the son's claims, who in turn emailed Desai.

412. Desai emailed Orozco back and told her that he did agree to waive L.D.'s shared costs if L.D. stayed at Riverside for two weeks.

### c)  G.W.

413. Orozco also attempted to collect shared costs from patient G.W.

414. Every time Orozco called G.W., Orozco would speak with G.W.'s daughter who informed Orozco that Dr. Ghaly told G.W. she would not have to pay anything to stay at Riverside.

415. When Orozco raised this with her managers, Ayrapetyan told Orozco not to collect any shared costs from G.W.

### i.  Corporate Defendants pay patients' rents to keep them in the facility.

416. In or around 2014, a patient drove himself to Riverside, and when he arrived, he informed admissions that Dr. Ghaly told him that he needed rehabilitation, and that Riverside would "help with the rent."

417. Patient D.N. also drove herself to Riverside in or around 2013.

418. When D.N.'s 100 Medicare days were up, Ayrapetyan instructed Orozco to give D.N. cash and instructed Desai to pay for a hotel room for D.N. for a month.

419. Orozco has witnessed some patients being enticed to stay at Riverside by Riverside staff telling the patients that Riverside would pay the rent for their apartments if they stayed.

420. Specifically, Orozco has witnessed Martindale, Campbell, and Ayrapetyan make this promise to patients.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

421. One patient, R.V. lived in Section 8 subsidized housing, and would have lost the subsidy if he stayed at Riverside for more than one month.

422. Because of this, R.V. kept trying to leave Riverside to ensure that his home would not be taken away.

423. Tillman and Riverside's marketer at the time, Pena, told R.V. not to worry about losing his house that they would pay the rent for R.V. to ensure he kept his Section 8 subsidized housing.

424. Another patient who lived in Section 8 subsidized housing was R.S.

425. R.S. was admitted to Riverside with scabies and told by Dr. Ghaly that he would only need to stay at Riverside for three days.

426. However, at the end of the three days, Dr. Ghaly told R.S. that he needed to stay at Riverside another week.

427. Ultimately Dr. Ghaly told R.S. that he had to stay at Riverside for three weeks.

428. Because R.S. had scabies, Riverside billed for R.S.'s stay under the "isolation" code, which is billed at $1,000 per day.

429. Riverside billed as if R.S. was in isolation even though R.S. refused to stay in isolation conditions, and would often leave his room to walk around the facility.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

430. During R.S.'s stay, R.S. received therapy, although Orozco is unsure what kind of therapy R.S. needed since his only diagnosis was scabies.

431. Concerned about his housing, R.S. was getting increasingly frustrated with Dr. Ghaly and Riverside.

432. To calm R.S. down, and keep R.S. as a patient at Riverside, Tillman offered to write a letter to the state to ensure R.S. would keep his Section 8 subsidized housing even if R.S. remained at Riverside for an extended period of time.

433. R.S. became so frustrated with Riverside that he ultimately packed his belongings and left Riverside.

434. Riverside, through its administrators, Ayrapetyan, and Robin, also induces homeless patients to stay at Riverside for the 100 day maximum by offering to pay for a motel room for the patient, once the patient is discharged from Riverside, and work to get the patient into long-term housing.

435. When the homeless patients are discharged, Rhead, Martindale, Desai, Pennachio or Ayrapetyan would go to a low quality motel, pay for one month's rent in cash and then make no further attempt to assist the patient in obtaining long-term housing.

436. Orozco knows that Rhead, Martindale, Desai, Pennachio and Ayrapetyan would do this because Orozco was in charge of the petty cash and would have to give the cash to whoever was paying for the motel.

437. Ayrapetyan instructed Orozco to indicate in the records that the cash was used to purchase wheel chairs.

### ii. Riverside pays cash to some patients to induce them to stay at the facility.

438. In addition to paying rent for some patients, Riverside, and the other Rockport facilities Ayrapetyan oversees offers some patients, or the patients' family members, cash to induce the patient to stay at Riverside for the 100 day maximum.

439. Orozco knows that this same practice of inducing patients to stay at the facility by offering to pay the patient, or the patient's family, cash also occurs at all of the other facilities Ayrapetyan oversees as well as Santa Ana, another facility owned by Rechnitz where Smith and Martindale currently work.

440. Orozco recalls one patient, S.A. whose daughter was a drug addict.

441. S.A.'s daughter wanted to take S.A. out of Riverside because S.A. was the daughter's representative payee for social security purposes.

442. Desai and Martindale agreed to pay the daughter $50 a day to keep S.A. in Riverside.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

443. On another occasion, a patient B.C. walked out of Riverside and went home because he was frustrated with having to stay at Riverside, and because he was confused.

444. On the evening B.C. left Riverside, the Charge Nurse contacted the Director of Nursing at the time, Elphete Zapanta and told Zapanta about B.C. leaving.

445. Zapanta told the charge nurse to find B.C. and bring him back.

446. Based on this instruction, the charge nurse sent two Certified Nursing Assistants ("CNA") to look for B.C.

447. When the CNAs found the B.C. wandering around, they offered to pay him cash to come back to Riverside.

448. Orozco recalls another patient the staff referred to as Mr. Corona (not his real name), who was a drug addict who left Riverside to do drugs.

449. At the daily meeting, it was brought to Ayrapetyan and Robin's attention that Mr. Corona left the facility to seek, and use, drugs.

450. Upon hearing this, Ayrapetyan and Robin told the staff that they needed to get Mr. Corona back.

451. One of the marketers at the time, Pena, spent the day looking for Mr. Corona and ultimately found him.

70

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

452. Pena offered to give Mr. Corona money if Mr. Corona went back to Riverside with Pena – this was despite the fact that drug use disqualifies a patient for Medicare.

453. Riverside also pays for cab rides for family members of medicare patients to come visit patients at Riverside.

454. But, if a patient's insurance switches from Medicare to Medi-Cal, Riverside stops paying for the cab rides.

455. On one occasion, Dr. Ghaly told R.S., whose wife was at a different hospital, that if R.S. stayed at Riverside, Riverside would allow, and pay for R.S. to visit his wife.

456. Orozco knows that this practice of paying for a patient's or their family's cab rides occurs at Orange Healthcare as well.

### iii. Riverside unnecessarily admitted Orozco's mother into Riverside.

457. In or around July 2013, Orozco took her mother, M.C., a Medicare beneficiary at the time, for a routine checkup with Dr. Ghaly.

458. When Orozco dropped her mother off at the office, Orozco told her mother to call when she needed to be picked up.

459. During M.C.'s visit, Dr. Ghaly told M.C. that she needed to go to the hospital.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

460. Based on this instruction, Orozco took her mother to Parkview Community Hospital and again waited for her mother.

461. After approximately four hours of waiting, Orozco went into Parkview to check on her mother.

462. Dr. Ghaly had admitted M.C. to the hospital and M.C. was not discharged for three days, which was a qualifying stay under Medicare's regulations.

463. While at Parkview, Dr. Ghaly encouraged M.C. to go to Riverside for rehabilitation therapy even though it was unclear what type of skilled nursing services or rehabilitation M.C. required for her medical condition.

464. Because M.C. was Orozco's child care provider at the time, Riverside's administrator at the time, Rhead, and Ayrapetyan offered to hire a babysitter for Orozco for two weeks while M.C. stayed at Riverside.

465. Additionally, Rhead requested, and Ayrapetyan approved, $600 to pay toward M.C.'s plane ticket to travel to Nicaragua to visit family after she was released.

466. M.C. was only in the hospital for three days, for an unknown reason, was not put on any medication, and did not require rehabilitation.

467. While M.C. was at Riverside, Dr. Ghaly avoided Orozco so as to not have to discuss M.C.'s medical condition.

468. At the time, Orozco did not have access to patient's medical records or charts and therefore could not see why her mother had been admitted to Riverside.

469. While at Riverside, M.C. did complain about knee pain, and received physical therapy.

470. When it came time to discharge M.C. from Riverside, M.C. requested a prescription for pain medication for her knee.

471. However, because Dr. Ghaly never evaluated M.C. for knee pain, and did not prescribe any pain medication for M.C., Riverside's discharge nurse told M.C. she could not receive a prescription for medication, but rather that she should take some vitamins.

472. Upon leaving Riverside, M.C. went to another doctor who diagnosed M.C. with knee problems, and wrote M.C. a prescription for her knee pain.

473. M.C. stayed at Riverside for two weeks, as Dr. Ghaly recommended.

### iv. Riverside purchases specialty items for Medicare patients to keep them at the facility.

474. When a patient indicates that they want to leave Riverside before their Medicare approved service is up, Riverside's marketers, administrators, Ayrapetyan, and Robin instruct Riverside's nurses to tell the patient that Riverside will buy them whatever they want if the patients stays for the entire time approved by Medicare.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

475. Orozco recalls one Medicare patient, Mr. R.B, who did not need therapy but was approved by Medicare to receive a high level of therapy.

476. Mr. R.B told his nurse, Harjinder Singh (who goes by the name "J.R."), that he wanted to leave Riverside and was going to leave if Riverside didn't give him $5.00.

477. J.R. went to Tillman to ask for $5.00 to give Mr. R.B, however, Tillman was not in the office at the time, so J.R. asked Orozco for $5.00 from the petty cash.

478. Even after Mr. R.B. left Riverside, he kept coming back to the facility to ask for money, but Orozco would refuse to give Mr. R.B money.

479. In some instances, Riverside purchases new televisions for patients that the patient can take home.

480. One patient, Mr. G., was brought to Riverside from Riverside Community Hospital and did not want to stay at Riverside.

481. At one of the daily meetings, it was reported that Mr. G. did not want to stay at Riverside.

482. Later that day, when Orozco asked Pena if he spoke with Mr. G, Pena responded "Yea, we took care of it" and smiled at Orozco.

483. Later that day when Orozco went to Mr. G.'s room to speak with Mr. G., Orozco saw that Mr. G. had a large, forty inch television set in his room, when Riverside's rooms only have nineteen inch television screens.

484. Orozco knows that Ayrapetyan approved the television Pena purchased for Mr. G because the television was listed on Pena's expense report

485. In other instances, Riverside pays to have food delivered from a patient's favorite restaurant to persuade the patient to stay.

486. If a patient wants a special food order, the administrators takes the patient's order and then tells Perez to go and pick up the food for the patient; this is a regular occurrence at Riverside.

487. Orozco recalls one patient, G.J., who liked to collect shoes and often ordered shoes from the Eastbay magazine to be delivered to Riverside.

488. At some point during G.J.'s stay, some of the staff members started complaining that G.J.'s shoes were taking up too much room.

489. When confronted about his shoes, G.J. told Desai that if he did not have his shoes, he would leave Riverside.

490. In response, Desai acquiesced to letting G.J. keep all of his pairs of shoes at the facility, and even purchased G.J. more pairs of shoes.

**v.  Riverside allows Medicare patients to use drugs in the facility.**

491. It is common knowledge among Riverside management that some patients are using drugs – some even joked that the cash they gave patients would be used for drugs.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

492. One Medicare patient, M.D., was known as a troublemaker, so Riverside paid her to leave the facility, paid for her hotel, and reimbursed her for her share of costs.

493. While M.D. was at Riverside, she often used drugs at the facility.

494. Under Riverside's policies, Riverside was supposed to discharge patients if the patients use drugs in the facility.

495. In reality, when Riverside management or staff sees Medicare patients using drugs, they ignore the problem.

496. One night, Orozco saw patients smoking weed outside of the facility.

497. Orozco told Registered Nurse Supervisor (PM shift) Adam Lomarda but he said there's nothing she can do.

498. Orozco then told Rhead, who did nothing in response to her complaint.

499. At a later point, Orozco found a spoon and a lighter in a patient's room, which is usually used for heroin use.

500. Orozco told Rhead about the spoon and lighter, but Rhead told her that she could not assume that the patients were using drugs.

### III.   Defendants Knowingly Present False Claims for Payment or Approval to Medicare.

501. Defendants knowingly present false claims or cause to be presented false or fraudulent claims for payment or approval to Medicare by: assigning nearly all of

its Medicare patients to rehabilitation therapy (unnecessary services); placing almost all of its Medicare patients on the highest and costliest forms of rehabilitation therapy (upcoding); failing to provide services for which they billed but did not perform; and extending nursing stays (unnecessary services).

502. Ayrapetyan instructs all therapists and doctors to assign Ultra High (RUx) RUG levels for patients' rehabilitation therapy.

503. This is so each patient is approved for the maximum amount of therapy.

### c. Riverside nurses do not adequately assess patients.

504. When a patient is admitted to Riverside, the patient should be assessed by the Director of Nursing and then assessed by one of the therapists to determine whether or not the patient also needs therapy.

505. The doctor is then supposed assess the patient within five days of the patient being admitted to ensure the patient needs skilled nursing care and sign off on all of the patient's orders.

506. The doctors at Riverside do not usually come to assess the patient within the first five days of the patient's stay resulting in unsigned or forged paperwork.

507. If the patient is admitted as a Medicare patient then the therapist is always supposed to indicate that the patients need Physical Therapy ("PT"), Occupational Therapy ("OT"), and Speech Therapy ("ST") every day.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

508. After a patient has been at the facility for five days, the MDS Nurse is supposed to complete the MDS assessment questionnaire online for the patient.

509. The MDS score correlates with the RUG level that the patient should be assigned.

510. The MDS questionnaire is completed by filling out information in the patient's chart as entered daily by therapy and the nursing staff.

511. The information is then supposed to be reviewed by the MDS Nurse prior to being entered into the MDS questionnaire.

512. At Riverside, the licensed nurses do not chart on the patients every day like they are supposed to, but rather one charge nurse, Mayra Gallegos is responsible for charting on every single patient in the facility every single day.

513. Given the copious amount of work this requires, Gallegos often copies chart notes from previous days or other patients to save time.

514. At Riverside, the MDS nurse, Lindsey Licup, does not review the chart notes of the patient's assessment, and simply enters exactly what is written in the patient's chart into the MDS questionnaire.

515. Since Gallegos is making up chart notes, Licup enters incorrect, made up information into the MDS questionnaire for patients.

**d. Riverside falsely inflates patients' diagnoses.**

516. If a patient comes into Riverside for a minor issue, for example, to get an IV, or for scabies, Riverside will inflate the patient's diagnosis code in order to bill for some type of therapy.

517. The intake nurse or the doctor is responsible for assessing the patient and determining what the appropriate diagnosis code is for the patient.

518. Orozco as Riverside's biller was required to bill for whatever diagnosis was marked in the patient's chart because Orozco is not a nurse or doctor and cannot examine the patient to determine the patient's diagnosis code.

519. Sometimes the nurses at Riverside will not enter any diagnosis codes on the patients chart.

520. If this happened, Ayrapetyan and the administrators instructed Orozco to enter the first five codes available on the chart.

521. When Rockport's Medical Records Consultant, Gina Galang, saw that the nurses were not entering diagnosis code, Galang instructed the nursing staff that the MDS nurse is supposed to assign the diagnosis code and enter the primary and secondary diagnosis codes into the computer system, at which point Orozco is supposed to enter the diagnosis codes from the computer system into the billing system.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

522. Riverside Business Office Consultant Anne Dixon (also known as Chavai Williams) instructed Orozco to select five diagnosis codes to input in patient charts.

523. Orozco, being inexperienced with billing codes, would perform preliminary searches of diagnosis codes and insert them in the billing systems.

524. Every month, Orozco was supposed to meet with the MDS nurse, who at the time, was Lindsey Licup,  for a "triple check" meeting where the MDS nurse would verify each patient's diagnosis and chart was correct.

525. For a long time, Licup would not participate in the triple check meetings.

526. When Orozco was promoted to biller in or around June 2014, Galang required Licup to be at all triple check meetings.

**e. Riverside assigns nearly all of its Medicare patients to rehabilitation therapy and places them on the highest level of therapy possible.**

527. As described above, many of Riverside' patients are not appropriate candidates for rehabilitation because they can independently drive themselves to the facility, can leave under their own power, or in the case of M.C., have no medical condition that would require rehabilitation.

528. Riverside's therapists, per Ayrapetyan's instructions, keep patients' RUG levels consistent throughout their time, suggesting no improvement despite intensive therapy.

529. Riverside's therapy services are subcontracted through Integro Rehabilitation.

530. Integro Rehabilitation's director of rehabilitation at Riverside used to be Zendie Avendano, who was uncomfortable lying about a patient's therapy requirements or health status.

531. When a patient was fully rehabilitated, Avendano would send an email to Ayrapetyan stating that the patient had completed all their physical therapy and that it was to release that patient from Riverside.

532. In response to Avendano's email, Ayrapetyan would ask Avendano how many Medicare days the patient had left.

533. If the patient had more Medicare approved days left, Ayrapetyan would tell Avendano "no" and to extend the patient's therapy plan.

534. Ayrapetyan sent these emails to the therapists daily.

535. Avendano found this difficult to do because often times the patients were fully rehabilitated and there was no additional service the therapists could offer the patient.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

536. In or around November 2014, Avendano was promoted within Integro Rehab, and Chris DeVera was hired to director of rehabilitation at Riverside.

537. DeVera had no problems following Ayrapetyan's directions to lie about a patient's therapy needs, or extend the patient's therapy plan to extend the patient's stay.

538. Licup would often tell the therapists that if a patient was receiving the highest level of therapy services, the therapist would have to show some consistent progress in their patient notes as it would look suspicious to say a patient was declining, or not improving, for ninety nine days and then say the patient is fully recovered on day 100.

539. In response to Licup's charting concerns, DeVera said, "I'm just doing what Aneta [Ayrapetyan] told me."

540. Completing the MDS assessment to obtain the highest RUG level, and keeping patients on therapy for the entire length of their approved stay is the standard operating procedure at all of the facilities Ayrapetyan oversees.

**f.   Riverside fails to provide the services for which it billed.**

541. Ayrapetyan and Tillman instructed therapists to continue to bill for rehabilitation services even when the patient does not want to participate in therapy.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

542. In instances where a patient does not want to participate in rehabilitation therapy, the therapists are told to sit in the patient's room with the patient for forty-five minutes and bill for the "services."

543. In many instances, the therapists would perform about fifteen minutes of therapy but bill for forty-five minutes of therapy.

544. The administrators and Ayrapetyan instructed the therapists to document this time with the patient as if they had performed services.

545. If a therapist mentioned during Riverside's daily meeting that a patient does not want to participate in therapy, the administrator would say something to the effect of "well make them be compliant, or I will make them be compliant."

546. To get the patient to be compliant with therapy, Tillman would go to the patient's room and say "hey, why don't you come take a walk with me" and Tillman and the patient would walk around facility and talk.

547. At the end of the walk Tillman would go to the therapist and tell the therapist to document the walk as that day's therapy for the patient

548. One patient in particular, M.S. weighed close to 600 pounds and did not want to get out of bed, or participate in therapy at all.

549. The therapist would come to M.S.'s bed, and give him little bar bells and make him do ten curls.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

550. This was considered his therapy for the day despite the fact the M.S. was approved for, and being billed for the highest RUG level.

551. In some cases, when a patient did not want to participate in rehabilitation, the therapist would indicate that the patient was "extremely weak."

552. Orozco would later observe this same patient pushing other patients around the facility in a wheel chair.

553. One patient Mr. R would often refuse to participate in rehabilitation but would often push around a fellow patient, J.L.

### g. Riverside unnecessarily drugs certain patients to quell their screams.

554. Riverside has about four to five patients that are "screamers," meaning they scream and yell loudly for long periods of time, and the entire facility can hear them.

555. Before any audits, important visits, or open houses, Riverside Licensed Vocational Nurse David Alva told Orozco that he was instructed to "dope up" patients to "put them to sleep" so they will not scream.

## IV.   Defendants Submit False Records or Statements Material to False Claims to Medicare.

### a. Falsifying records related to patients' share of costs.

556. Every year, Medi-Cal and Medicare conducts an audit.

84

557. When Riverside is audited, the company simply creates fake receipts to indicate that the patient did pay the 20% coinsurance and share of costs.

558. Additionally, Riverside maintains a policy not to throw any paper in the trash cans but instead throw the paper in the shred bins.

559. Rechnitz owns a medical waste recycling company which comes to Riverside every Monday to shred bins of paper.

**b. Doctors refuse to maintain accurate records; staff forge doctors' signatures.**

560. Riverside maintains a protocol that requires all doctors to sign in and record the patients they examine when they work at the facility.

561. Riverside created this protocol because family members of Riverside patients were complaining to the staff that the doctors were never coming to see their relatives.

562. Riverside wanted to be able to show the patients' family members that the doctors were coming to see the patients regularly.

563. Additionally, Riverside wanted to keep records of care to justify the services being billed to Medicare.

564. The doctors at Riverside refuse to sign in or record which patients they examined on the log.

565. Medicare requires the patient's doctor to see the patient upon admission and document why the patient is appropriate for treatment.

566. Dr. Pengson would not come to Riverside to see a patient until he had to sign paperwork for the patient.

567. Medicare requires signatures on all medical orders and records.

568. A facility is not allowed to bill until all of the required paperwork is signed by the patient's doctor.

569. At Riverside, sometimes the doctors would not sign all of the paperwork required.

570. Orozco recalls one occasion in or around 2013 when Dr. Pengson traveled to Europe for approximately two weeks.

571. During this time Dr. Pengson could not, and did not, sign any medical records or documents for his patients.

572. When the doctors do not sign patient records, like when Dr. Pengson was in Europe, Medical Records Director Carol Manly instructs Riverside staff to forge the doctor's signature and date the document as if the doctor signed it.

573. According to Orozco, auditors have asked Riverside about the inconsistencies of handwriting or ink between the signature and the date on certain patient documents.

574. When an RN Supervisor complained about the paperwork and the doctor's refusal to complete their patient log to Medical Records Consultant

Jonalyn Rivera, Robin told the staff to ignore the rule, and let the doctors continue to do what they were doing.

575. Robin told staff that the doctors are allowed to do whatever they want and if the doctors are upset, people would be fired.

576. Robin told Orozco specifically, "do not mess with the doctors."

**c. Riverside management directs its staff to falsify their signatures and timesheets so that Riverside is in compliance with State-required staffing levels.**

577. Skilled nursing facilities such as Riverside, and the other Rockport facilities, are required to meet certain staffing requirements based on the number of patients in the facility, called "PPD" requirements. For example, a Certified Nursing Assistant cannot be responsible for any more than eight patients at a given time.

578. Whenever Riverside has a staffing audit, managers are asked Riverside staff to falsify employee signatures and time sheets to represent that Riverside is in compliance with the State-required staffing levels.

579. Because of this payroll falsification, nurses will often be paid for hours they do not work.

**d. Riverside instructs its employees to pretend to be Medicare patients to ensure that benefits continue.**

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

580. A recent change in California law implements a program called Cal-Mediconnect, which switches Medicare and Medi-Cal beneficiaries to HMO-managed plans unless the beneficiary objects to the switch.

581. The HMO-managed plans will approve rehabilitation services only on an as needed basis, not in chunks of time, like Medicare approves.

582. In many cases, Riverside's patients did not read the packet explaining the law or the change to their plan either because they did not care, did not understand, could not read the packet because of their medical condition, or could not properly verify their identification over the phone to the State.

583. For many of the same reasons, many patients did not respond to the information at all, thereby causing their insurance to be switched from Medicare or Medi-Cal to an HMO-managed plan.

584. Tillman and Ayrapetyan instructed the administrative staff at Riverside, including Director of Admissions Rebecca Brizuela, Assistant Business Office Manager Brenda Ponce, Receptionist Dinorah ("Erica") Hamilton, Pena, a volunteer named Mario Garcia, and Orozco to take turns calling the State and tell the State that they were the patient or the patient's family member and request the patient's insurance remain Medicare, and not be switched to an HMO.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

585. Riverside staff only made these calls pretending to be patients for patients who were not very alert, or who did not have family involved in their care, thus taking advantage of the most vulnerable patients.

586. In or about September 2014, Dr. Ghaly sent an e-mail to Smith, who then provided it to Orozco.

587. Dr. Ghaly's e-mail provided information for Riverside staff to relay to patients and patient families outlining the benefits of disenrolling from the HMO-managed plans and how enrolling in an HMO was bad for their Medicare benefits.

588. Tillman instructed the staff to print out the patient's face sheet (a sheet that displays a patient's demographics and insurance information) and use the information on the face sheet to verify the patient's identity over the phone to the State.

589. Riverside's medical director, Dr. Pengson also instructs the Riverside staff to encourage patients to disenroll from the HMO-managed health plans.

590. During a Quality Assurance Meeting in the January 2015, Dr. Pengson attended the meeting and wanted to know what Riverside was doing to address the automatic HMO-managed enrollment for its patients.

591. When Orozco told Dr. Pengson that the administrative staff was speaking to the families and patients about the change, Dr. Pengson told Orozco that the staff at Riverside needed to disenroll the patient no matter what, and the

staff should go so far as to tell the patients that Dr. Pengson does not accept the HMO provider plan to encourage patients to disenroll.

592. Orozco knows that Orange engages in this same practice as Ayrapetyan sent an email to the Riverside and Orange business office managers instructing them to call the State as if they were the patient and disenroll the patient from the HMO-managed plan.

593. When Orozco spoke with Orange's business office manager, Angie Rivera, she asked Orozco what Riverside was doing about patients who were not alert, or did not want to transition back to a Medicare managed plan.

594. When Orozco told Rivera that Tillman was instructing the Riverside staff to call and pretend to be the patient, Rivera responded that Ayrapetyan had instructed the staff at Orange to do the same, but that Rivera was not comfortable doing that.

595. Riverside withholds medical services from patients who refuses to disenroll from the HMO-managed plan.

596. R.B. was previously on Medicare and then switched to Medicare on United Healthcare (an HMO); he frequently complained that Riverside nurses treated him poorly ever since he switched to United Healthcare and that no one paid attention to his needs.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

597. When Rockport Regional Business Director Joy Smith was visiting Riverside she learned about R.B.'s situation.

598. Smith wanted R.B. to disenroll from the United Healthcare and then have a "change of condition" that would trigger a three-night hospital stay so that he could qualify for 100 days of Medicare Part A.

599. However, R.B. was happy with United Healthcare and did not want to disenroll from United Healthcare.

600. Later, Ayrapetyan learned of the situation and forced R.B. to call United Healthcare to disenroll.

601. When R.B. got on the phone with United Healthcare, he refused to disenroll and remained covered under United Healthcare.

602. However R.B. would sometimes complain that he did not feel well and needed to go the hospital.

603. Ayrapetyan told the nurses at Riverside that they were not allowed to send R.B. to the hospital until he disenrolled from the HMO-managed plan.

604. Starting around November 2014, through her termination in February 2015, Orozco witnessed nurses falsifying patient's conditions at least six times a month.

**e. Riverside pressures patients to disenroll from private insurance in order to receive Medicare benefits.**

605. L.L. was one of Dr. Pengson's patients at Orange.

606. L.L. was obese, bipolar, and suffered from gangrene on her feet.

607. In or about 2014, L.L. was on Medicare and Dr. Pengson recommended intense therapy for L.L.

608. However, a month later, when L.L. was no longer on Medicare but on an HMO plan, Dr. Pengson stopped therapy and refused to provide therapy unless LL disenrolled from her HMO.

609. L.L. was confused as to why Dr. Pengson stopped providing her with therapy because, while she was on Medicare, he told her she was in great need of the therapy.

610. Eventually LL disenrolled from her HMO, underwent a qualifying three night stay at a hospital and her 100 days of Medicare Part A benefits were refreshed.

**f.   Riverside falsifies patient conditions to re-certify a patient.**

611. As previously discussed, a Medicare patient's benefit period includes 100 days of skilled nursing facility care as well as a sixty day wellness period.

612. During the sixty day wellness period, the patient must not be in a skilled nursing facility or hospital, or, if the patient remains in a skilled nursing home facility, the patient must not have received skilled care there for at least sixty days in a row.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

613. Riverside triggers false "change of conditions" for its patients in two situations: 1) for long-term patients; and 2) to get rid of patients who have exhausted their 100 days of Medicare benefits.

614. To trigger the false change of condition, Ayrapetyan texts the nurses responsible for patients at Riverside, and the other facilities she oversees, and tells the nurse that "these patients need a change of condition today" and lists the patients' names.

615. After receiving this text, the nurse calls 911, claiming that the patient is having heart or breathing problems.

616. An ambulance comes and picks up the patient and brings the patient to Parkview.

617. Once at Parkview, the patient is usually assigned to Dr. Ghaly, Dr. Pengson, or Dr. Tabel, depending on who the patient was assigned to at Riverside.

618. As previously described, Riverside pays Dr. Ghaly, Dr. Pengson, and Dr. Tabel and these doctors will purposefully not examine the patient for three days.

619. After being in the hospital for three days, the patient is deemed to have had a qualifying stay for Medicare's purposes.

620. Whether or not the doctor discharges the patient to Riverside depends on the type of patient's insurance coverage.

### i. Long-term patients

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

621. Riverside has about twenty long-term care patients with Medicare benefits.

622. Riverside provides these long-term patients with therapy for 100 days using Medicare coverage.

623. When that 100 days exhausts, Riverside no longer provides the patients with the therapy.

624. Instead, for sixty days, Riverside's RNA nurses will walk the patients around the facility but will not provide them with any therapy.

625. Thus, the long-term patients have their sixty day wellness period at Riverside.

626. Once the long-term patient completes his or her sixty day wellness period, Riverside triggers a false "change in condition" to send the patient back to the hospital for a three night qualifying stay; this refreshes the long-term patient's 100 days of Medicare benefits.

627. The long-term patient is then discharged to Riverside to receive 100 days of Medicare skilled nursing facility care, even though such services are medically unnecessary.

ii.   **Discharging patients who have exhausted their Medicare benefits.**

628. After a patient has exhausted his or her 100 days of Medicare, usually the patient will switch to Medi-Cal or private pay.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

629. Riverside wants to minimize the number of Medi-Cal and private pay patients it treats and maximize the number of Medicare patients it treats.

630. To usher certain patients out of Riverside, once the patient's 100 days of Medicare have exhausted, Riverside triggers a change of condition to send the patient to the hospital.

631. Then it is up to the hospital case manager or doctor to determine to which facility to send the patient.

632. If the hospital case manager sends the patient (who is now either Medi-Cal or private pay – not Medicare) to Riverside, Riverside will reject the patient saying that it does not have enough Medi-Cal or private pay beds.

633. This method allows Riverside to quickly shed itself of patients who are no longer covered under Medicare.

**V. Corporate Defendants Fail to Remit Overpayments to Medicare.**

634. Every quarter, Riverside is required to fill out a Medicare Overpayment Report stating the amount the facility owes Medicare due to overpayments it received during that quarter.

635. The first time Orozco saw this form, when she was promoted in the spring of 2014, Orozco asked Riverside's Business Consultant Ann Dixon how to complete the form.

636. Dixon told Orozco to enter zeros in all of the columns and have the administrators sign the form.

637. Dixon instructed Orozco to enter all zeros even though, internally, Riverside's accounting books show that Riverside receives overpayments from Medicare.

638. The following month Orozco examined the form more closely and asked Dixon why they would enter all zeros if they received overpayments.

639. Dixon responded that she would explain the process to Orozco at a later time, but she never did.

## VI.   Defendants Violate the California False Claims Act

### a.  Corporate Defendants discriminate against Medi-Cal patients.

640. Defendants treated Medicare patients very well; they spent more time with Medicare patients, responded to any concerns, provided gifts and cash, took lunch requests, etc.

641. However, many patients who were previously on Medicare but later switched to Medi-Cal noticed that when their insurance switched, so did Defendants' treatment of them.

642. For example, when Medi-Cal patients complain about their food, Riverside management ignores the complaints.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

643. However, when Medicare patients complain about their food, Riverside management provides the patient whatever the Medicare patients wants, even if it is against the patient's medically-required diet.

644. If Medi-Cal patients complain that it is too hot in their rooms, Riverside management ignores the complaints.

645. However, when Medicare patients complain about it being too hot in their rooms, Riverside management provide the patients with an AC unit or a fan in their rooms.

646. Most of Riverside's patient rooms house two patients, however Riverside had a private rooms –  provided only to Medicare patients.

647. Riverside has three nursing stations.

648. Riverside places most of its Medi-Cal patients in station two which has older rooms and the worst nurses.

649. As such, nursing station two – which consisted primarily of Medi-Cal patients – gained the reputation of housing patients that "smelled" and "yelled all day."

650. Riverside also provides Medicare – but not Medi-Cal patients – with specialty goods, such as blankets with Riverside's logo imprinted on it or water bottles also carrying Riverside's logo.

651. While Riverside management instructs its staff to make daily visits to all Medicare patients, it does not encourage these same visits to Medi-Cal patients.

652. All patients have "call lights" that they can trigger to request a nurse.

653. Riverside nurses often yell at Med-Cal patients and ignore their call lights.

### i.   Shared Costs

654.   While instructing Orozco and other Riverside staff to not collect shared costs from Medicare patients, Ayrapetyan simultaneously told the staff to collect all shared cost payments from Medi-Cal beneficiaries.

655.   Despite waiving the shared costs for Medicare patients, Riverside routinely tells Medi-Cal patients that they had to pay their share of costs.

656.   Ayrapetyan instructed the staff to collect shared costs from all Medi-Cal beneficiaries because Medi-Cal only pays $200.16 per day for a patient's stay at Riverside, and the facility wants to recoup as much money as possible for Medi-Cal patients.

657.   One patient in particular, D.J., a Medi-Cal patient, frequently complained to the staff and to the State of California that he felt discriminated against because of his health insurance.

658.   D.J. complained that Riverside tried to evict him but treated Medicare patients very well.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

659.   Susan Reah, Riverside's business office manager prior to Orozco assuming the position, quit her position because she felt pressure from Desai to collect 100% of shared costs from Medi-Cal patients.

660.   Rockport has its own collection department which aggressively attempts to collect shared costs from Medi-Cal patients from all of its facilities, including Riverside.

**b.   Corporate Defendants provide kickbacks to employees to discharge Medi-Cal patients.**

661. Corporate Defendants encourage employees to discharge Medi-Cal patients, thereby making room for more lucrative Medicare patients, by providing employees incentives to discharge Medi-Cal patients.

662. In or around March 2012, Robin approached Riverside's then Director of Social Services, Ted Johnson, and told him that Riverside needed to start making room for Medicare patients.

663. To achieve this, Robin told Johnson that for every Medi-Cal patient Johnson was able to discharge from Riverside, Robin would pay Johnson $100.

664. In or around February 2012, when Orozco started working payroll, Johnson came to Orozco and asked for his bonus.

665. Since Orozco did not know what Johnson was talking about, Orozco asked Riverside's administrator at the time, Chris Romney, about Johnson's bonus.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

666. Romney told Orozco about Robin's deal with Johnson, and instructed her to process the bonus in Johnson's paycheck.

667. The bonus is processed through payroll and the approval comes directly from Robin.

668. Riverside often referred many of its Medi-Cal patients to facilities owned by Joanie (last name unknown).

669. Joanie owned multiple assisted living facilities and board and care facilities.

670. Joanie would often visit Riverside patients and recruit them to her facilities.

671. Further, Corporate Defendants also provide Medi-Cal patients with incentives to leave Riverside including paid hotel rooms and cash.

672. For example, in or about 2013, Riverside Administrator Micah Rhead paid one patient, A.N, $300 to leave the facility.

673. A.N. was previously on Medicare and was about to begin her Medi-Cal coverage, as such Corporate Defendants did not want her at the facility and provided cash as an incentive to leave.

674. Another patient, D.G., complained that she wanted to leave Riverside because she felt that once she switched from Medicare to Medi-Cal Riverside did

not treat her well and Riverside Case Manager Ted Johnson did not want to help her find an apartment.

675. Orozco told Johnson what D.G. said, Johnson said he did not care about D.G. and to let her leave Riverside.

676. Another example occurred in or about 2013 or 2014 when a Medi-Cal patient Mr. S. came from Parkview Hospital with 100 days of Medicare.

677. Once his 100 days exhausted, Riverside case manager Johnson wanted to discharge him quickly to make room for Medicare patients.

678. Johnson instructed Central Supply Director Yocelin Perez to drive Mr. S. to his apartment.

679. Mr. S. lived by himself and his place was a mess; Perez did not feel comfortable leaving him alone at his apartment but did so because of Johnson's instruction.

680. When Mr. S. was left alone, he fell, was sent back to the hospital, and died as a result of the fall.

681. Riverside discharged Mr. S. from Riverside even though he was not healthy enough to go home; Riverside discharged Mr. S. to make room for Medicare patients.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**c. Corporate Defendants fail to provide for services to Medi-Cal patients for which they had billed.**

682. Corporate Defendants do not provide Medi-Cal services for which they bill the State.

683. In general, Riverside provides Medi-Cal patients with inadequate medical care.

684. For example, one Medi-Cal patient, Sheryl Reeves(last name unknown), was paralyzed from the neck down and was unable to reach the call light in her room.

685. Because Sheryl was unable to press the call light and because Riverside largely ignored her due to her insurance status, Riverside failed to rotate Sheryl in her bed causing Sheryl to suffer from severe bed sores.

686. Sheryl often complained that no one took care of her.

687. As a result, the California Department of Health issued Riverside a deficiency for their inadequate care of Sheryl.

**d. Corporate Defendants submitted materially false information to Medi-Cal**

**i. Bed holds**

688. When a rehabilitation patient on Medi-Cal has to go to the hospital, the facility in this case, Riverside, is required to hold the bed for seven days, and bill at a lower rate of $185 per day.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

689. Because the doctors do not come to Riverside very often, many times the nurses have to sign the bed-hold orders as if they were the doctors.

690. Orozco knows that other facilities under Ayrapetyan did this too.

691. Every year, the State performs an annual Medi-Cal audit where each facility has to supply the bed-hold orders the doctors issued throughout the year.

692. At Riverside, Riverside Medical Records Director Carol Manly and Riverside Medical Records Consultant Jonellyn Rivera would review all the bed-hold orders prior to the audit, and have the doctors sign the bed-hold orders, or have the nurses sign the doctor's name.

693. Sometimes Riverside would not even have a bed-hold order for a patient who required one, so the nurses would have to create one.

694. Any time Medicare requests documents for an audit, Ayrapetyan has Galang look over the documents, and sign for the doctors, or complete missing documentation.

## ii.  Medi-Cal audits

695. As previously discussed, every year Medi-Cal and Medicare conduct an audit.

696. Prior to the audit, Rockport sends Rockport's Medical Records Consultant Gina Galang to Riverside prepare for the audit.